UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIPT # 65349
AMOUNT $ 250.00
SUMMONS ISS. 10
LOCAL RULE 4.1
WAIVER OF SERV.
MCF ISSUED
AO 120 OR 121
BY DPTY CLK
DATE 7-5-05

ALBERT HENRY CORLISS,
        Plaintiff,

v.                                    COMPLAINT

CITY OF FALL RIVER and                VIOLATION OF CIVIL RIGHTS,
DOES 1-10,                            FREEDOM TO ASSEMBLE,
        Defendants.                   PURSUANT TO TITLE 42 U.S.C..
                                      SUBSECTION 1983

05-11406DPW

*Referred to MJ Leo T Sorokin*

I.      INTRODUCTION

1. Plaintiff alleges that on or about May 5, 2001, the Fall River Police Department
ordered his pick-up truck to be towed from the Watuppa Indian Reservation. Plaintiff
was the Council Chairman of the Nemasket Troy Indian tribe who had been holding
regular (monthly) meetings, events, etc., on the reservation which was given to the
Indian for their exclusive occupancy and use in 1705. A fact well known to the defendant.
The towing and confiscation of plaintiff's personal property was intended to send a
"chilling" message to the Indians that the entire Watuppa Indian Reservation is under the
jurisdiction and control of the City of Fall River. (Hereafter "City") This towing and
confiscation is a continuum of a policy, custom and practice employed by the City since
1907. The plaintiff desires a recovery of his goods and stoppage of the institutionalized
behavior on behalf of the City which has effectively deprived the Indian of the peaceful
enjoyment of his deeded reservation.

II.     PARTIES

2.  Plaintiff, Albert Henry Corliss, sues on behalf on himself ("pro se") and also

as Council Chairman of the Nemasket Troy Indian tribe whom it is alleged has sole

possessory and control rights over Watuppa Indian reservation upon, or concerning

which, the aforementioned actions occurred.

    3.  The defendant, City , was incorporated in 1854.

    4.  Does I-10 are unknown to Plaintiff at this time.

## III.  JURISDICTION

    5.  This court has jurisdiction under Title 42 U.S.C. subsection 1983 provides, in
relevant part, that

> "Every person who, under color of any statute, ordinance, regulation,
> custom or usage... subjects or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress..."

    6.  Under the 1st Amendment - Bill of Rights - Plaintiff has expectation
of Peaceful Assembly without undue interference.

## IV.  STATUTE OF LIMITATIONS

    7.  The plaintiff is seeking the recovery of  his vehicle and personal  and

tribal items, including but not limited to, a battery lent to plaintiff by Council member

Donald Palardy. Massachusetts law allows a six year statute for return of goods. "Under

42 U.S.C. Subsection 1983 the plaintiff alleged police unlawfully arrested beat and towed

his car. Statutes of Limitation applying: One year for false arrest, 2 years for personal

injuries and six years for actions seeking the recovery of goods applied to the towing claim." Polite v. Diehl, 507 F2d 119 (CA 3d 1974)

III.    BACKGROUND

8.  The real property in question (275 Indiantown Road, Fall River, MA) is part of the Watuppa Reservation, granted to the Province of Massachusetts Bay for the Benefit of "Indian Natives" by deed from Benjamin Church in 1709. (See Addendum - Exhibit A - Benj. Church deed -  2 pages-  and Note: "But always to be continued & used for a plantation & settlement for the Indian Natives." - Page 2 -  Line 26-7 )

9.  In 1861, Troy Indian Tribe members (Perry, Crank) ask the Massachusetts legislature to divide the reservation and award families or individuals plots in fee simple. (See: Exhibit B - "Petition of Troy Indians" - Earle Report - 1861 - Section C - State Library of Massachusetts - Special Collections.)

10.  The Petition was approved (reading 666) then rejected (reading 675) leaving the Indians understandably confused but the reservation whole and tribal land. (See: Exhibit C - House Journal, 1862 - 4 pages)

11.  At or around the same time other Indians, this time, Zurviah G. Mitchell, a direct descendant of Wampanoag sachem, Massasoit, makes legal claims on Watuppa and prevails. (See: Exhibit D, Appendix B., Dubuque Report, 1907, see: Exhibit E,  #12)

12.  In 1907 City covets the Watuppa Indian  Reservation and attempts to seize it under the guise of protecting its water supply. City succeeds in taking half the property.

-3-

(See: Exhibit E, "Fall River Indian Reservation" report by City Solicitor, Hugo A. Dubuque, 1907. Included 1st 32 pages.) According to the report (page 11, line 22) "the Indian Natives have now disappeared."

13. The Massachusetts legislature ratified the taking in Mass Acts 1907, chap 493, sec 1. (See Exhibit F , Mass. Acts 1907 - Chap 493., June 12, 1907, 3 pages) Of interest, the Acts now mention a Fanny I. Perry, an Indian living on the reservation.

14. City moves the Perry house to the half not taken. (It was from here that Plaintiff's vehicle was towed.) Note: City provide little frontage for necessary ingress/ egress off Indiantown Road. Effectively ending future development. (See: Exhibit G - map of 1907 and Exhibit H- present assessor's map. Reservation designated Perry Heirs. )

15. Which has left the Indian confused yet resolute in recovery of their "Promised Lands". (See: Exhibit I [1] - unknown newspaper article of 1970 and Exhibit I [2] - 1999 Gathering of Wampanoag Leaders- Francis Farm - fall 1999 - Agenda- "Watuppa".)

IV.    FACTS

16. On or about April 20, 2001 while returning from a Nemasket Troy Council meeting plaintiff's car broke down on Route 24. Because he had trouble starting the vehicle he borrowed a battery from Council member Palardy (Who had it for his boat.) Because the reservation was closer than his Brookline residence he had his vehicle towed back to Watuppa Reservation. It was registered, insured and marked with signs inside front and rear windows indicating to whom it belonged, tribal name and phone numbers to contact if necessary. (See: Exhibit J - Plaintiff's title to vehicle.)

-4-

17. Soon thereafter car disappears and no contact is made. The first news the plaintiff has of the missing vehicle comes via certified letter from a towing company, Levesque Auto Services a now defunct towing service. (See: Exhibit K - two "Notice(s) to Owner"- First dated June 30, 2001 - 2 pages)

18. Plaintiff replied via letter December 26, 2001 inquiring why he had not been given proper notice. (Three sequential letters) More importantly plaintiff inquired where of the authority to tow off the reservation. (See: Exhibit L - Letter to Levesque Towing.)

19. Soon thereafter a man called from Levesque Towing claiming plaintiff's problem was with the Fall River Police. He provided a copy of tow form. (See: Exhibit M - Copy of "Auto Removal Form" , dated May 5, 2001. The form indicates the vehicle was not involved in an accident, nor stolen or abandoned but something listed as "other"?)

20. In order that a group of Indians could occupy the reservation and hold social political and religious services at the so-called Perry farm the plaintiff paid out of his personal funds Hanks Southeastern Propane for the winter heating during his Council Chairmanship. (See: Exhibit N - Check and receipt for propane. Dated 10/5/00)

21. On December 9, 2000 decided by council vote the tribal name, the "Nemasket and Troy Wampanoag." (See: Exhibit O - Council vote 12/9/2000- Tribal log available. )

22. The Nemasket and Troy Council sought various federal funding as tribe. (See: Exhibit P - Learning and Telemedicine Grant Application of March 1, 2001 - USDA)

23. Around this time, early Spring 2001, the plaintiff, as Council Chairman contacted the City Council of Fall River clearly explaining our position, seeking

-5-

understanding and suggesting a safer and more efficient ingress and egress to and from
the reservation. (See: Exhibit Q - March 24, 2001 letter to Fall River City Council - 2
pages.)

24. On or about February 15, 2005 the plaintiff inquired, via a "Freedom of
Information Request", the tax status of the reservation from the Commonwealth. They
suggested the plaintiff contact the Board of Assessors for City. (See: Exhibit R - February
15, 2005 letter from Mass. Department of Revenue.)

25. On or about March 1st, 2005 City Tax Assessor Ms. Pamela Davis provided
plaintiff with tax information re: Watuppa Reservation. City has listed as owners the
Perry, P. H. heirs and the property is listed as a "charity" valued at $244,500. There
is no mention of an Indian reservation. (See: Exhibit S - Assessor's 2005 card -2 pages)

## V.    LEGAL CONSIDERATIONS

26. It is well settled that the rights and obligations of the Native Americans,
unique to Indian law, derive from a legal status as members or descendants of an Indian
tribe, not from their race. "The right of the individual Indian is, in effect, a right of
participation similar in some respects to the rights of a stockholder in the property of a
corporation." F. Cohen, Handbook of Federal Indian Law, 183 (1942, reprinted 1971)

27. "If a city has an official policy that causes a civil rights violation then the city
can be liable under 1983." Monell v New York (1978) 436 US 658, 56LED 2d 611, 98 S
Ct 2018)

28. "Plaintiff must demonstrate that the violation of his right was caused by

either a policy or a custom of the municipality. Beck v City of Pittsburgh 89 F 3d 966, 971 (Cir. 1996)

29. "To make a prima facie case under Subsection 1983 plaintiff must demonstrate that a person acting under the color of law deprived him of a federal right." (See: Gorman v Makalapan? 47 F. 3d 628,633 (3rd Cir. 1995) and "The next step is to "identify the exact contours of the underlying right said to have been violated." County of Sacramento v Lewis, 523 U.S. 833, 841 n.5, 118 S. CT. 1708, 140L. Ed. 2d 1043 (1998)

30. And "First inquiry in any case alleging municipal liability under Subsection 1983 is question of whether there is a causal link between policy and custom and alleged Constitutional deprivation." City of Canton, Ohio v Harris, 109 S.Ct. 1197 (1989)

VI.    ARGUMENT

31. The plaintiff represents that the Nemasket Troy tribe of Indians is the only tribe or group of Indians who has "standing" to sue on Watuppa reservation at the time of the alleged incident. Two members of the Council, Barbara Stevens and Donna Mitchell were Perry descendants and Dolores LeClaire is a Mitchell descendent. (See: Exhibit O - Supra - Tribal logs available.) The tribe was in physical possession of the so-called Perry farm and the reservation. (The tribe paid the utilities, held Council, pows-ows, meetings, etc. on the land.) According to the Earle Report, via possession they matched their progenitors, the Troy/ Fall River Indians who "are distinct from the remaining Indians of the region thereabouts (who had a common origin with them) only by the fact of their possession of the plantation." (See: Exhibit T - Earle Report, 1861, line 23-25,

-7-

Library of Massachusetts, Special Collection.)

32. While greed may explain the actions of City in 1907 it may be tempered to some degree by the fact that the nostrum did help protect the City's water supply. However, the canard (Allegation in Dubuque Report - Exhibit E - supra) that the Indian had now "disappeared" while they were very much extant becomes recondite when the City is forced to move a remaining Indian family and the Perry farmhouse. Still only a climate of racism explains the division of the reservation by an obscurant City. (Leaving little or no ingress/egress thereby effectively stifling further reservation development.)

33. Throughout the Dubuque Report (Exhibit E - Supra - Example Page 7, 1st P) City Solicitor expounds the parlous theory that Indian control/possession of their lands is somehow trumped by City relief /charity... real or imagined. This apocryphal policy or custom been continued by City for almost a century. For example, presently City claims the Reservation is a private charity solely for the sole benefit of the Perry heirs. It mentions with no Commonwealth involvement. It is like the Church Deed of 1709 has disappeared. (See: Exhibit S - Assessor's card for 2005 - supra)

34. This policy is wrong for two basic reasons: One; Presumably whatever relief (charity) City was/is providing the Perry heirs comes in the form of tax relief or the non-taxation of the real property which already has Constitutional protection against any governmental taxation via its status as an Indian Reservation and Two; If analogous to an Arizona case where the state sought to impose income tax on Indian living on the reservation even though the source of the income was within the reservation the court

-8-

held Arizona can exercise neither civil nor criminal jurisdiction over reservation Indians "The tax is resisted because the state is totally lacking in jurisdiction over both the people and the lands it seeks to tax... Much like the land itself." McClanahan v State Tax Com of Arizona 411 U.S. 164, 93 S.Ct. 1257 (1973). Thus the City gains no control or jurisdiction over the remaining Watuppa Indian Reservation by not taxing it and it seems clear that the City of Fall River has no jurisdiction or control over the Watuppa Reservation by providing charity (real or imagined) to those inhabiting it.

35. And the proof of 1907 policy of "control through charity" existing today is exhibited by City in a show of power over a nascent tribe by succinctly insulting its sovereignty. City's Council had been alerted to the tribe's intentions via the letter of March 24, 2001 (See: Exhibit Q , supra.) Rather than deal forthrightly with the tribe City decides to send a "chilling" message of power and control by towing plaintiff's vehicle.

## V.    CONCLUSION

36. On this Independence Day when our armed forces are engaged in defending encouraging and supporting freedom and democracy worldwide it behooves us to closely inspect and understand the product we are exporting. Representative constitutional government did not come from the Romans nor the Greeks it was a Native American product (Iroquois Confederation) and if defending one's native land, freedom and opposing foreign oppression makes one a patriot than our own sachem, King Philip, is the paradigm. And his story, his legacy is still very much with us. Recently, there has

-9-

been legislature activity to remove a law still on the books passed in 1675 during King Philip's War, called the Boston Indian Imprisonment Act which ordered the arrest of all American Indians entering the city. This case addresses another embarrassment.

The argument can be made that the Watuppa Reservation should have been awarded to the local Indian tribes as reparation after our Revolution of 1776 by reason of it being a "war trophy" originally given to Indians who fought with the British. The plaintiff comes forward not as a vestigial irredentist but advocating more profound principles. City's towing of plaintiff's vehicle achieved its intended result. It threw the Indians in turmoil, kept a reservation from a needy population and crushed a tribal effort at nation building. An effort of a people to govern themselves and to peacefully enjoy their own land. It kept control of a sovereign Indian Reservation in the hands of an intermeddler where it has been for almost a century. Nothing could be more un-American.

VI.     DEMAND FOR JURY TRIAL

VII.    PRAYER

37. WHEREFORE plaintiff prays for damages in the following order:

SPECIAL - In the amount of Sixteen Hundred and Fifty Dollars. ($1650.00)

GENERAL - In the amount of Ten Million Dollars. ($10,000,000.00)

And any other and further relief as the Court deems just.

Respectfully submitted,

Date: July 4, 2005

Albert H. Corliss
("Pro Se")

-10-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ALBERT HENRY CORLISS,
     Plaintiff,

v.

CITY OF FALL RIVER and
DOES 1-10,
     Defendants.

_____

COMPLAINT

VIOLATION OF CIVIL RIGHTS,
FREEDOM TO ASSEMBLE,
PURSUANT TO TITLE 42 U.S.C.,
SUBSECTION 1983.

## VERIFICATION

1. The plaintiff, Albert Henry Corliss, resides at 1514 Beacon Street, Suite 43,

Brookline, MA 02446;

2. Plaintiff is bringing this Complaint, "Pro Se" and in his capacity as Council

Chairman for the Nemasket Troy Wampanoag Indian Tribe;

3. Plaintiff has been a member in good standing of the California Bar since 1980.

(State Bar #97160 - currently inactive);

4. Plaintiff verifies that all the accounts, facts, etc. put forth in the aforementioned

Complaint are true and all allegations are trustworthy.

Dated: July 4, 2005

Albert H. Corliss
"Pro Se'
1514 Beacon Street, Suite 43
Brookline, MA 02446
(617) 731-1309

-11-

CERTIFICATE OF SERVICE

I, Albert Henry Corliss, the plaintiff, certify that on this date July 5, 2005, served a copy of the foregoing COMPLAINT - VIOLATION OF CIVIL RIGHTS, FREEDOM TO ASSEMBLE, PURSUANT TO TITLE 42 U.S.C., SUBSECTION 1983 and a *SUMMONS (Waiver of Service of Summons - 2 copies with self-addressed and stamped return envelope enclosed) on the Corporation Council, City of Fall River, Law Department, One Government Center, Fall River, MA 02722.

Dated: July 5, 2005

Albert Henry Corliss
"Pro Se"
1514 Beacon Street, Suite 43
Brookline, MA 02446
(617) 731-1309

ADDENDUM

To all People to whom these prsents shall come Benjamin Church of Tiverton in the County of Bristol in her Majesties Province of the Massachuset Bay in New England in America sendeth Greeting where as upon a proposall made to the Great & generall Court or Assembly of the sd Province in favour of ye Indians Natives Reesiding in ye Southern parts of the sd County of Bristol (Divers of whom have bin very serviceable on the present & former Wars and some of them brought up in English fami-llies) for exchainging some of the lands formerly granted to ye Govern.ment by Daniel miller Yioman since dec.d Lyming in Tiverton. and Allowed to the Indians for a settlem.t and Plantation with the sd Coll.l Church for land of his lyming more Commodious for the Indians settlem.t & more Remote from the English. The Generall Assembly at their sessions in October 1707 upon the Report of their Committee appointed to View the sd lands did Allow of the said proposall and exchainge & Directed that proper and Le-gall Instruments be drawn accordingly. The lands to be given in exchainge to be holden of her Majesties Government of ye sd Province by the sd Indians & their heirs forever. Yeilding to the Govern.r of the sd Province for the time being upon ye tenth day of December Yearly One quarter of good venison in Liew of all Rents & services not to be Assigned or Allienated but Continued an Indian Plantation forever as in and the said Courts Records Relation thereunto being had. may more fully appear Now Know ye that I the sd Benj.a Church pursuant to the sd proe Recited vote and for & in Consideration of the proposed exchainge viz two lotts of land heretofore of Daniel miler lyming in Tiverton within the said County of Bristol. by him Transferred to the Govern.t by them confirmed & made over to me by Deed bearing even date with these presents One lott N.o 14 Containing six score acres and the

the Number 2 Containing forty acres. Have given granted Bargained sold Released infeoffed and confirmed and by these presents for me & my heirs Do freely fully and absolutely give grant Release Convey and Confirm unto Joseph Dudley Esqr Present Governr of the Province of the Massachusett Bay aforesd the Councill & Assembly of the said Province and to their successors and Assignes forever Part of the said Benja Church his second & Third Great Lott of land being the easterly part of ym Lying scituate in ffreetown within the County of Bristoll aforesd Measuring One Mile and a Quarter in Length & sixty four Rods in width Containing One hundred & sixty Acres. Butted and bounded Northerly on the land of John Hillbore Easterly upon Tiverton undivided lands Southerly on the land of Constant Church and westerly on the great watupa Ponds or however other wise the same is Bounded or Reputed to be bounded Together with all and singuler the Trees timber woods underwoods water water Courses Stones fields feedings Marshes Meadows Rights members Profits Priviledges Commodityes advantages Hereditaments Instruments & Appurts what soever upon or in any wise belonging to the said several of land heretofore granted or to any or either of them And all the estate Right Title Interest Inheritance use property possession Claime and demand of me the sd Benja Church of in & to the same & the Reversion & Reversions Remainder and Remainders thereof To have and to hold the said lands & premises herein before granted with the members and Appurtces thereof to the sd Governr Councill & Assembly of the Province aforesd for the time being their successors and Assignes forever so as that the sd Land & premises shall from hence forth forever be and Remain at the free and absolute dispose of the Governr & Generall Assembly of the sd Province for the time being as the Governr and Genll Assembly may grant or dispose of any other Publique or Unappropriated land belonging to & within the sd Province of the Massachuset Bay, But allwayes to be Continued & used for a plantation & settlement for the Indian Natives And I the said Benja Church for me my heirs Executors & Adm's. Do Covenant Grant and Agree to & with the sd Governr & General Assembly for the time being their successors & Assignes to warrant and defend the said land & premises with the members and Appurtenances thereof unto them against the Lawfull Claime and Demand of all and every person & persons whomsoever In Wittness whereof I the said Benjamin Church have hereunto sett my hand and seal the fourth day of Aprill 1709 In the eighth year of the Reign of our Sovereign Lady Queen Anne

Signed Sealed and Delivered — Benja Church (S)

In presence of us

Benjamin Dyer

Thomas Maccarty

Suffolk ss. Boston Aprill ye 4th 1709 The within named Benja Church personally appearing before me ye subscriber One of her Majesties Justices of the Peace Acknowledged the within and above written Instrumt to be his Act and Deed

Isaac Addinton

Entered the 22d of Aprill 1709 By John Cary Recorder

A true copy from Book 5 Pages 468 & 469 of Bristol Co. No. Dist. Land Records

Attest:- Emma S. Pray, Examiner

A TRUE COPY OF INSTRUMENT AS RECORDED IN BRISTOL COUNTY FALL RIVER REGISTRY OF DEEDS IN BOOK 2 PAGE 140 - 141

ATTEST:

Bernard J. McDonald III

REGISTER

1861 S96

## C.

## PETITION OF THE TROY INDIANS.

*To the Honorable* JOHN MILTON EARLE, *Commissioner:*

DEAR SIR,—The undersigned persons of the Tribe of "Troy Indians" residing on the Indian Lands in Fall River would most respectfully ask you to present and recommend our petition to the General Court. We have a tract of land, containing about two hundred acres, and the same was divided, set off, and assigned to the several families of the tribe, about one hundred years ago. Since that time some of those families have become extinct, others have abandoned the lands entirely, and some have claimed rights to the land, whose title thereto, we think, is doubtful, and we respectfully pray the General Court to cause a division to be made of the whole tract, to each family or individual, who may be found entitled thereto, in such manner as will enable each to have his part in severalty, and that each may have a portion of land lying on one of the public roads, running through their lands, and also a lot of the wood land; and that the same may be set off, and bounded, so that each one may occupy his own separately.

And, as in duty bound, will ever pray.

HANNAH PERRY.
SARAH CRANE.
WILLIAM PERRY.
HENRY CRANE.

Indian Town, Fall River, August 15, 1859.

[The record of the survey, renewal of the bounds, and reassignment of the lots of the Fall River Plantation as approved by the General Court, in 1764, is as follows:]

I the subscriber, being appointed by yᵉ Honᵇˡᵉ Committe of yᵉ Genˡ Court to Renew yᵉ bounds, survey, subdivide and plan the 185 Acres of Land, which I make by survey to be 190 Acres & 64 Rods Granted by yᵉ General Court to Capt. James Church & Company, Indˡ. and have subdivid'd yᵉ same into twenty-eight Equeal parts and erected suitable

STATE LIBRARY OF MASSACHUSETTS
SPECIAL COLLECTIONS

bounds at yᵉ corners of each divisional part or lott. Fore of said parts is layed out in one lott at yᵉ north-west corner, next to yᵉ Pond, for yᵉ Hears or Legual Representatives of Capt. James Church, like wise marked on yᵉ plan, each lott yᵉ place of yᵉ house that stands thereon on those lotts where there is any, & yᵉ names of yᵉ indians that lives in them, and have set forth on each of yᵉ lots what improvement are made, & by whom made, and how long they have improved them. Each of yᵉ aforesaid eaqual parts contains 6 acres and 128 Rods.

The Boundaries of this aforesaid land is as followeth. Bounding West North West, upon Wattuppa Ponds & southwardly on yᵉ land that yᵉ Booths now owns, Begining at yᵉ middle of a flat rock, which is in yᵉ edg of sᵈ pond, south-west from a large white oak tree, Between sᵈ rock and another rock near to said white oak, and northwardly of sᵈ tree extending E. S. E. 2 Degrees S. 104 rods by a range of marked trees to a stump with a stake by it, an old ancient Bound mark, with a heap of stones around yᵉ same, And likewise from thence 60 rods to a gray oak tree, full mark, and so on by a range of marked trees 148 rods unto a ridged hill to an old white oak tree full mark, and from said white oak 69 rods to a stake with a large heap of stones about yᵉ same which is yᵉ south-east corner bound of yᵉ aforesaid land, which maketh the South line from yᵉ Pond to this head bound to be 381 rods, and from said south-east corner Bound, giving yᵉ point of compass on yᵉ head of said land, which appears to be on yᵉ Head line of the Freeman's Purchies of yᵉ township of Freen, North 30 degrees E. 71 rods & about 12 feet, to a small gray oak tree marked on three sides with a large heap of stones about yᵉ sam, which is yᵉ north-east corner bound of yᵉ aforesaid land, which maketh said land to be 77 rods wide, and from said north-east corner bound running W. N. W. 2 degrees N. By a range of marked trees, down to said Wattuppa Pond, To a scrub Black oak tree, full mark, which stands by yᵉ edg of sᵈ Pond with a heap of stones about yᵉ same, whitch fully appears to be yᵉ northwest corner Bound of yᵉ land aforesaid.

I humbly submit myself as in duty bound.

ZEBEDEE TERRY.

A Schedule of the lotts of the Indians' land and to whom they severally belong, lying in Freetown, in the County of Bristol.

The first lot containing Twenty-seven acres and thirty-two rods belongs to the heirs and legall Representatives of Capt. James Church, who died Aprill 1739 leaving two sons James & Isaac, and five daughters, Mary, Experience, Marcy, Mary & Phebe. Mary is alive, having one child, a daughter named Experience, who has five children.
Marcy is alive, having two children.

11



**The Commonwealth of Massachusetts**

William Francis Galvin, Secretary of the Commonwealth

March 2, 2000

House Journal, 1862
Vol. 85, pp. 51, 666, & 675

*A True Copy Witnessed Under the*

**Great Seal of the Commonwealth**

*William Francis Galvin*
*Secretary of the Commonwealth*

51.

Perkins' Institute Fire Ins. Co., in Winester. Pet. 102. Bill concerning 231.
241. 312. enacted 348.

Perkins, J. L. D. Pet. (See Burrill, same S.)

Perkins Institution & Mass. Asylum for the Blind, Report of Trustees of,
29. Use of representatives Hall granted to, on petition of Joseph Lay of, 241. 484.

Resolve (ordered) in aid of, 503. 535. 556. 564. 574.
582. passed. 653.

Perry, Samuel & others. Pet. 175.  (See Emery J. & others)

Peter William & another, Pet. 521. Resolve in favor of, 666. rejected 675.

Petitions, Order rel. to publication of notice of, 91. Report 558. acc. 568.

Bill concerning proof of notice in, 412. 424. 434. 439. enacted 452.

Order for not receiving after March 1st, reported, 294.

presented on & after April 9. Order to refer to next Gen. Court,
490. adopted 497.

Not reported upon, on or before April. 14. Order to refer to next
Gen. Court, 509. rejected. 517.

Phippps, James M. & others, Pet. 128. Bill (See Boston Union Relief Soc.)

Pickerel & other Fish, Order rel. to preservation of, 298.  (See Trout.)

Pierce, Richard A. & others, Resolve (leave) in favor of, 550. 637.
(See Military Companies, Co. B. 5th Reg.)

Pillsbury, Gilbert & others, Pet. 346. Report (leave) 411. acc. 420.

Pilot Commissioners, Report of 2nd 29.  Report (no legislation) acc. 395.

Pets. to abolish the office of, 72. 90. 108. 136.

Pet. to abolish the office of, taken from files of Com. 108.

Remonst. agst. abolishing office of, 140.

Report (leave) 294. Minority Report & bill, 294.

Bill to abolish the Board of, & for the regulating of
Pilotage, substituted, 406. Com. 414. Com. authorized
to report in print, 524. New draft, Bill concerning Pilotage 541.  (See Pilotage)

Pilotage, Bill concerning (see abra) 541. 561. 567. 575. 635. enacted, 668.

Pingree, T. P. Pet. 128. Report (leave) 238. acc. 249.

Plumer (Plummer) Thomas H. Pet. 55. See claims) 473. Report (leave)
535. acc. 545.

666

Tuesday. April 29. 1862.

reported that it ought to pass; and it was on mce ordered to a 2d reading.

**A. J. Jones** — Resolve in favor of A. J. Jones came down, passed to be engrossed in concurrence with amendments, which were non-concurred in by the House

**South Bay** — Resolve providing for an adjustment of certain land claims in South Bay, came down, & was read twice & ordered to a third reading.

**Conveyances** — Bill concerning mortgages in fraud of the insolvent laws, being a substitute for House Bill concerning fraudulent conveyances, came down & was read three times & passed to be engrossed in concurrence.

**Volunteers** — Report of the Committee on the Militia asking to be discharged from the consideration of the subject of the communication from the Allotment Commissioners, concerning families of volunteers in the state alms houses, came down, & was accepted in concurrence.

**W. Perry** — Resolve in favor of Wm Perry & another, came down, & was read & ordered to a 2d reading

**Wm H. Haven** — Resolve granting leave to Wm H. Haven to re-marry Hannah Haves & legitimating their issue, was read a third time & passed to be engrossed in concurrence.

**Taunton Police Court** — Mr Newburg of Newburyport, from the Committee on the Judiciary to whom was referred the Bill to abolish the Police Court in the town of Taunton reported that it ought not to pass.
Placed in the orders of the day for tomorrow.

675

Wednesday. April 30 1862.

Mr Chandler of Boston, on leave, introduced a Resolve in relation to sick & wounded soldiers, which under a suspension of the rules. Soldiers was read three times & passed to be engrossed

Mr Rodman of New Bedford, asked leave to introduce a Resolve in favor of Franklin H. Story; but leave was refused.    T H Story

The orders of the day were taken up.    B.

Resolves on the petition of W G Langdon, and
Providing for the adjustment of certain land claims in South Bay, and
Bill to establish the salary of the first clerk in the office of the Adjutant General;
were severally read a third time & passed to be engrossed, the two last named in concurrence & the first sent up for concurrence
Senate Bills, to abolish the Police Court in the town of Taunton, & Relating to marriage & divorce, & Senate Resolve in favor of William Perry and an... were severally rejected.

On motion of Mr Harding of Cambridge, the motion to reconsider the vote by which the Bill to change the raising of money for the im.. ...ment of the House of Correction in the county of Berkshire was passed to be engrossed, ...taken from the table.
The motion was agreed to, & the question re-

92

## APPENDIX B.

### Resolves 1861, Chapter 62.

### RESOLVES IN FAVOR OF ZURVIAH G. MITCHELL.

RESOLVED, That the governor and council be and they are hereby authorized to examine the claims of Zurviah G. Mitchell, and to ascertain what amount, if any, is still due to her for wood cut from her lots on the Indian territory, at Fall River, and sold by the successive guardians of the Indians at the place, for their benefit; and also to agree with the said Zurviah G. Mitchell, on a sum, for which on the payment to her, she will relinquish to the Commonwealth all her right, title and interest in and to said lots.

RESOLVED, That in case a satisfactory arrangement cannot otherwise be made with the said Zurviah G. Mitchell, of the sum to be paid to her for the relinquishment of her claims, the governor and council may agree with her on referees, to whom the question shall be left, and whose decision thereon shall be final and conclusive; subject, however, to the approval of the governor and council.

RESOLVED, That on the satisfactory adjustment of these matters, the governor be authorized to draw his warrant on the treasury for such amount as may be awarded to said Zurviah G. Mitchell, to be paid to her on the signing of such release as shall be satisfactory to the governor and council; said release to be a perfect and full discharge of the Commonwealth, and of the guardian of the Troy or Fall River Indians, from any claim she may have on the Indian land, at Fall River, or for wood which may have been cut thereon.

RESOLVED, That in case a satisfactory arrangement cannot be made with the said Zurviah G. Mitchell, for the relinquishment of her rights in the Indian plantation, the guardian of the Troy or Fall River tribe be authorized to proceed to survey and lay out her lots, by metes and bounds, according to the original laying out, giving her due notice of the time when it is done: provided, however, that the legislature shall not have previously provided otherwise, for a new survey and location of the several lots on said plantation.

Approved April 2, 1861.

# FALL RIVER

# INDIAN RESERVATION

BY

## HUGO A. DUBUQUE

City Solicitor of Fall River.

FALL RIVER, MASS.

1907.

# THE INDIAN RESERVATION
## and the
## WATER SUPPLY
### of
## FALL RIVER.

### 1907.

---

## BRIEF FOR THE CITY OF FALL RIVER.

The City of Fall River has presented a petition to the legislature of Massachusetts of 1907, through its mayor, at the request of its Reservoir Commission, which has charge of the protection of its water supply, asking for a special act transferring to the said City the interests of the Commonwealth, if any, in certain lands of the Fall River Indian Reservation; and authorizing it to condemn, by right of eminent domain, for the protection of the purity of its water supply, a part of said lands lying within the water shed of North Watuppa Pond which is the source of Fall River's water supply.

1. In 1656 Wamsutta, sachem of the Pocasset tribe of Indians, by leave of the colonial court of Plymouth, sold the four mile tract, known as "Ye Freemen's Purchase", to 26 purchasers.

> *Fenner, History Fall River,* (1906), *pp.* 4-5;
> *Collective History Freetown,* (1902), *p.* 1;
> *Peirce, Indian History,* (1878), *p.* 238.

In 1683 the government of Plymouth colony organized the above purchasers into a town, called Freetown, in the following words:

"July, 1683.  This court orders that the inhabitants of the Freemen's land att the Fall River shal be a Township and have a Constable and Grand Jury men and henceforth be called by the name of Freetown."

> *Peirce, Indian History, p.* 243, *App.*

The "Freemen's Purchase" included what is now the town of Freetown and about half of what is now Fall River.

II

protection of the purity of its water supply; namely, a certain tract of land situate in Fall River, in the county of Bristol, bounded and described as follows, viz: beginning at a drill hole in a stone bound set into the ground in the southerly line of Indian Town road, nineteen hundred and nineteen and 37-100 (1919.37) feet easterly from the intersection of said southerly line of Indian Town road with the easterly line of Blossom road; thence running in a southerly direction to a drill hole in a stone bound set in the ground at the northeasterly corner of land of the city of Fall River, recently purchased from Alfred Bridge: thence westerly in line of land of the city of Fall River to land of the city of Fall River and the North Watuppa pond; thence northerly by land of the city of Fall River and said pond to the northerly line of the land of said Indian reservation: thence easterly in said northerly line to the Indian Town road: thence to the point of beginning; containing one hundred and one and seven tenths acres of land, more or less, exclusive of highways crossing said tract.

SECTION 2.   The city of Fall River may take in fee simple, by right of eminent domain, the lands above described forming a part of the Indian Reservation, for the protection of its water supply, in North Watuppa Pond; and if upon a vote of its Reservoir Commission or of its city council it decides so to do, then it may file and record a statement of such taking in the office of the registry of deeds, in the Fall River District, of the County of Bristol, giving a description of the land taken: and also file a plan of the same; both such statement and plan being duly signed by its mayor: and when such statement and plan are duly signed, filed and recorded as aforesaid, then said described lands shall become and remain the property of said city of Fall River, in fee simple.

SECTION 3.   Any one aggrieved, or entitled to damages, by reason of any thing done or authorized by this act may recover the same from the city of Fall River, by filing a petition in the Superior Court for the County of Bristol, within one year from the date of taking aforesaid.   The aforesaid damages shall be assessed in the same manner as lands taken for the protection of the water supply of Fall River, as provided in section four of chapter one hundred and fourteen of the Acts of the year eighteen hundred and ninety one; but all sums received by the petitioners or predecessors in title from the Commonwealth or said city in the way of Indian or other relief, the obligations placed upon said city by section four of this act, or by the general laws relating to the grant of relief or otherwise applicable to the petitioners; the non-

III

payment of taxes by the petitioners or predecessors in title, or their failure to discharge public obligations or to participate in the support or maintenance of city, county, state or national governments or to contribute to the state whatever was required in any deed relating to said lands and all other easements, conditions, water and flowage rights connected with said lands, the occupancy or use of said lands; and whatever other matters may be allowed by way of set off, recoupment, counterclaim or mitigation of damages, shall be allowed in reduction of damages for the taking of the lands aforesaid. Interest on the sums recovered shall only run at the rate of four per centum per annum from the date of taking; but in case of occupancy after the taking, such interest shall only run from the termination of such occupancy.

SECTION 4. The city of Fall River, its successors or assigns, shall maintain and discharge towards the present rightful occupants of the land conveyed or taken all duties that the Commonwealth is lawfully required to perform as the successor of the Province of Massachusetts Bay. But said city if it take the land before described, and if it decide, hereafter, that the houses or other buildings on the parts herein conveyed or taken should be removed, to a place beyond the area deemed necessary for the protection of the purity of its water supply, shall remove such buildings and all persons and their chattels, at its expense, to such other part of said Indian reservation, as may be without such area, and shall make suitable provision in the same buildings or in similar ones to be used by said occupants for a comfortable dwelling therein, and for safe and reasonable means of access thereto from the public road or highway.

SECTION 5. This act shall take effect upon its passage.

4

2. In 1803, the "southerly part of Freetown in the County of Bristol" was divided, and the town of Fall River was established.

*St.* 1802, *Chap.* 89, *Approved February* 26*th*, 1803.

In 1804 the name of Fall River was changed to "Troy".

*St.* 1804, *Ch.* 2.

In 1834 the name of the town, which for nearly thirty years had been Troy, was changed back again to Fall River, to remain so to this day.

*St.* 1834, *Ch.* 14.

In 1854 the town of Fall River was organized into a city.

First city charter:

*St.* 1854, *Ch.* 257.

Second city charter;

*St.* 1885, *Ch.* 269.

Third city charter;

*St.* 1902, *Ch.* 393.

3. In 1871 the city of Fall River was "authorized to take, hold and convey into and through the said city, by suitable aqueducts or pipes the waters of the North Watuppa Pond," to supply its inhabitants with water.

*St.* 1871, *Ch.* 133.

Under this statute it constructed its water works and expended several million dollars in providing tanks, pipes and hydrants to convey the waters of the North Watuppa Pond into the different parts of the city for domestic, fire and manufacturing purposes.

4. In consequence of the large increase of population, in Fall River, it became necessary, first, to avoid the occupancy of land within the water shed of the North Watuppa Pond, to preserve the purity of the water in the same, and, second, to provide a storage basin to increase the capacity of the water supply from this Pond.

Beginning with 1891 there was passed a series of acts for the protection of the Fall River water supply.

*St.* 1891, *Ch.* 114;
*St.* 1892, *Ch.* 362;
*St.* 1895, *Ch.* 478;
*St.* 1897, *Ch.* 285.

5

These acts provided, in substance, that the city of Fall River might condemn, by eminent domain, or acquire by purchase, the lands lying within the water shed of North Watuppa Pond.

In 1895, the Reservoir Commission, charged with the duty of carrying out the purposes of the special legislation just alluded to, was created by an ordinance of the city council of Fall River.

*Fall River Revised Ordinances. Ch. 45.*

In pursuance of the authority granted by the legislature. under the special laws cited, the Reservoir Commission condemned and purchased the lands bordering on said North Watuppa Pond. to prevent the contamination of its waters. and the various springs. streams or brooks feeding the same.

In 1905 a new ordinance was passed. repealing the former one, and reconstituting the Reservoir Commission on a different basis. So that, under the ordinance now in force, the three members of the Water Board, with the mayor and the city engineer, form the Reservoir Commission.

*Fall River City Doc.* 1905, *pp.* 651-2.

In 1902 the Reservoir Commission secured the services of Mr. Arthur T. Safford, of Lowell, as a special consulting engineer on the subject of Fall River's water supply, its increased capacity and the protection of its purity.

He made a voluminous report, accompanied by maps and various recommendations, among which was the necessity of securing all the lands adjacent to the pond. and within the water shed thereof.

*Report of Reservoir Commission,* (1902) *pp.* 274-5.

5.  The city has expended, for the protection of its water supply, in the purchase of land, around the North Watuppa Pond. since the first special act passed for the purpose, (St. 1891, Ch. 114), the sum of $272,955.37.  And it is now engaged in securing the small part that remains to be purchased or condemned.

6.  Under the special acts cited, while the city is authorized to take land by eminent domain to protect its water supply, it is not authorized to take the lands that the State is interested in. or that it holds for a different public purpose.

The rule seems to be that where lands are devoted to a public purpose they cannot be applied. under a general law, to a new or different public use, when the latter is inconsistent with the former.

(1892) *Boston v. Brookline,* 156 *Mass.* 172.

6

As was said by Chief Justice Shaw: "It sometimes happens that the full enjoyment of two public rights would, to some extent, interfere with each other; as where a highway, turnpike or railroad crosses a navigable stream. It is then for the legislature to determine which shall yield, and to what extent·········· according to the greater preponderance of public necessity and convenience".

(1859) *Commonwealth v. Essex Company*, 13 *Gray* 239,247.

The title to lands in which the State has an interest does not pass by implication but requires a special grant.

(1832) *United States v. Arredondo*, 6 *Peters* 691,738.

Rose's notes to same, p. 325 and cases cited;

(1837) *Charles River Bridge v. Warren Bridge*, 11 *Peters* 417.

Rose's notes to do, p. 682 and cases cited.

7. A grant of title of public lands may be made by an act of the legislature; and if such an act be passed, then there is no need of the state executing a deed in the usual form.

(1815) *Mayo v. Libby*, 12 *Mass*. 339,
(1828) *Ward v. Bartholomew*, 6 *Pick*. 414,
(1819) *Baker v. Fales*, 16 *Mass*. 488.

8. The maintenance of an Indian Reservation would imply the use of buildings and dwelling houses thereon; whereas the appropriation of land by the city, to prevent the contamination of its water supply, implies that barns, pig pens, outhouses and dwelling houses shall not be erected thereon. Therefore, the two purposes being practically inconsistent, it requires a clear expression of legislative intent, by a special act, to authorize the city of Fall River to condemn any part of the lands of the Indian Reservation.

9. Another reason for the special act is that the title to these lands is uncertain; yet the city of Fall River must have a clear title to apply the same to the public use which it has in view. The lands in question were conveyed to the Province of Massachusetts Bay, as will appear hereafter. A division of the lands was subsequently made, but the State kept exercising control over them, as well as over the occupants thereof. All the Indians granted land in severalty by the partition of 1764 have, of course, long been dead, and no one is absolutely certain that any of their true lineal descendants are in existence to-day.

The lands in question are now occupied by a single family, namely, that of Fanny L. Perry; but it is not intended to disturb her occupancy, if the special act, prayed for, is granted by the legislature. She has a settlement in Fall River and has received relief, in the past, and is entitled to it in the future, under the general laws. In other words, the city of Fall River is obliged to provide for her support in case of need.

10. The city has expended, in poor relief, to occupants of these lands, the sum of $2,837.94, from 1870 to date, of which $2,089.20 have been paid for the support of Fanny L. Perry's family.

### Constitutional Law.

11. In 1788 when the constitution of the United States was finally adopted, it was provided therein that "Congress shall have power············to regulate commerce with foreign nations, and among the several states, and with the Indian tribes······"

*U. S. Const. Art.* 1 § 8.

This gave exclusive jurisdiction to the federal government over Indian tribes that still maintained a tribal organization, and prevented the states from interfering with the same thereafter.

(1832) *Worcester v. Georgia,* 6 *Peters* 515.
(1856) *Fellows v. Blacksmith,* 19 *How.* 366.

12. But the several states still kept jurisdiction of the remnants of tribes that did not maintain the attributes of tribal government:

"In some of the old states—Massachusetts, Rhode Island and others—where small remnants of tribes remain, surrounded by white population, and who, by their reduced numbers, had lost the power of self government, the laws of the state have been extended over them, for the protection of their persons and property";

McLean, J. in .

(1832) *Worcester v. Georgia,* 6 *Peters,* 515.

And in our own state, Gray, J. said:

"The remnants of Indian tribes, residing within the limits of the Commonwealth, having never been recognized by any treaties or executive or legislative acts of the government of the United

8

States, as independent political communities, were under the control of the legislature of the state.''

(1871) *Danzell v. Webquish*. 108 *Mass*. 133.

### Title to Indian Lands.

We have on this subject a very instructive decision of Chief Justice Marshall in

(1823) *Johnson v. McIntosh*. 8 *Wheaton* 543; 5 *Law. Ed*. 681.

He says at page 570: ''On the discovery of this immense continent. the great nations of Europe were eager to appropriate to themselves so much of it as they could respectively acquire. Its vast extent offered an ample field to the ambition and enterprise of all; and the character and religion of its inhabitants afforded an apology for considering them as a people over whom the superior genius of Europe might claim an ascendency. The potentates of the old world found no difficulty in convincing themselves that they made ample compensation to the inhabitants of the new, by bestowing on them civilization and Christianity, in exchange for unlimited independence. But. as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle which all should acknowledge as the law by which the right of acquisition. which they all asserted, should be regulated as between themselves. This principle was that discovery gave title to the government by whose subjects, or by whose authority. it was made, against all other European governments, which title might be consummated by possession.''

''In the establishment of these relations, the rights of the original inhabitants were. in no instance. entirely disregarded; but were necessarily, to a considerable extent impaired. They were admitted to be rightful occupants of the soil, with a legal as well as just claim to retain possession of it. and to use it according to their own discretion; but their rights to complete sovereignty, as independent nations. were necessarily diminished, and their power to dispose of the soil at their own will, to whomsoever they pleased, was denied by the original fundamental principle that discovery gave exclusive title to those who made it.''

''While the different nations of Europe respected the right of the natives, as occupants, they asserted the ultimate dominion to

be in themselves; and claimed and exercised, as a consequence of this ultimate dominion, a power to grant the soil, while yet in possession of the natives. These grants have been understood by all to convey a title to the grantees, subject only to the Indian right of occupancy.

"The history of America, from its discovery to the present day, proves, we think, the universal recognition of these principles."

At page 691: "By the treaty which concluded the war of our revolution, Great Britain relinquished all claim, not only to the government, but to the 'propriety and territorial rights of the United States,' whose boundaries were fixed in the second article. By this treaty, the powers of government, and the right to soil, which had previously been in Great Britain, passed definitively to these states. We had before taken possession of them, by declaring independence; but neither the declaration of independence, nor the treaty confirming it, could give us more than that which we before possessed, or to which Great Britain was before entitled. It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty, subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right was vested in that government which might constitutionally exercise it."

And later, Miller J. in (1886) *United States v. Kagama*, 118. *U. S.* 375; 30 *Law. Ed.* 228, said at p. 230: "Following the policy of the European Governments in the discovery of America towards the Indians who were found here, the Colonies before the Revolution, and the States and the United States since, have recognized in the Indians a possessory right to the soil over which they roamed and hunted and established occasional villages. But they asserted an ultimate title in the land itself, by which the Indian Tribes were forbidden to sell or transfer it to other nations or peoples without the consent of this paramount authority. When a Tribe wished to dispose of its land or any part of it, or the State or the United States wished to purchase it, a treaty with the Tribe was the only mode in which this could be done. The United States recognized no right in private persons, or in other nations, to make such a purchase by treaty or otherwise. With the Indians themselves these relations are equally difficult to define. They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as Nations, not as possessed of the full attributes

of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided."

14.   Speaking of the St. 1869, C. 463, which enfranchised the Indians in Massachusetts, and removed all disabilities to which they had theretofore been subject, the present Chief Justice of our Supreme Court, then associate justice, said:

"Previously, all the common lands had been held and controlled by the Commonwealth for the benefit of Indians, who were treated as wards of the State.   The State recognized only certain equitable rights of ownership in the Indians, and it kept their property, and exercised a guardianship over them to protect them from the consequences of their improvidence."

(1891) *Drew v. Carroll*, 154 *Mass.* 181, 183.

The Indian title did not go to the fee, but only gave to the aborigines a right of possession, occupancy or improvement.   The Indian, according to the Anglo-American common law, was in the position of a life-tenant, having the use of his land during his life, with the remainder, after his death, going over to the State, in all lands which were held by him in severalty; whereas the lands held by the Indians in common went to the survivors among other Indians, if there were any, and after their extinction to the State.

(1837) *Clark v. Williams*, 19 *Pick.* 499;
(1873) *United States v. Cook*, 19 *Wall.* 591;
(1831) *Cherokee Nation v. Georgia*, 5 *Peters* 1;
(1823) *Johnson v. McIntosh*, 8 *Wheaton* 541;
(1889) *Cherokee Nation v. Southern Kansas Ry.Co.,*135 *U.S.*641;
(1871) *Danzell v. Webquish*, 108 *Mass.* 133
1 *Kent, Commentaries, p.* 258 (14*th ed.* 1896).
*Sutherland, Notes on U. S. Const., p.* 138 (1904).

### Title to Indian Lands in Fall River.

15.   The deeds which relate to the title of the Indian Reservation are given in detail immediately following this Brief.

Reduced to its smallest compass, it appears that one Daniel Wilcox, to pay a fine of £150, conveyed in 1701 to the Province of Massachusetts Bay, about 160 acres of land which he owned as one of the original Proprietors of the Pocasset Purchase.

This land was thereafter (in 1709) conveyed by the Province to Benjamin Church in exchange for lands constituting the present Indian Reservation, which said Church conveyed to the Province of Massachusetts Bay at the same time. This latter conveyance of Church stated that the land consisted of 160 acres. Zebedee Terry who surveyed it in 1763 found 190 acres, 64 rods; whereas we find actually to-day that it amounts to 195 7-10 acres.

The habendum clause, or conveying part, of the Church deed to the Province is as follows:

"to have and to hold the said lands & premises herein before granted with the members and Appur<sup>ces</sup> thereof to the sd Govern<sup>r</sup> Councill & assembly of the Province aforesd for the time being their successors and Assignes forever so as that the sd Land & premises shall from hence forth forever be and Remain at the free and absolute dispose of the Govern<sup>r</sup> & Generall Assembly of the sd Province for the time being as the Govern<sup>r</sup> and Gen<sup>ll</sup> Assembly may grant or dispose of any other Publique or unappropriatted land belonging to & within the sd Province of the Massachusetts Bay, But allways to be Continued & used for a plantation & settlement for the Indian Natives."

Of course this was to be held for Indian Natives as long as there were any of them left; but the Indian Natives have now disappeared.

As to the construction of this Church deed; does it impose a condition subsequent, a breach of which would cause a forfeiture, or a reversion of the land to the original grantor? Or does it simply create a public trust, the object of which having been ultimately attained, the doctrine of *cy-pres* may now be applied to the subject of the trust?

The authorities in this Commonwealth establish conclusively the proposition that such a deed is not one upon a condition subsequent, the violation of which works forfeiture or reversion.

In a case where the deed gave the lot of land for a meeting house "to be built or rebuilt on the said lot of land forever", the lot had not been used for a meeting house for several years. The heirs of the original grantors brought a writ of entry to enforce the forfeiture or reversion of the land.

Bigelow, C. J. said:

"There are no apt or proper words to create a condition; there is no clause of reentry or forfeiture. The only words which bear any semblance of an intent to restrict the title conveyed by the deed are found in the habendum. These are merely. that the

12

grantees, the proprietors of pews, should hold the estate for the purpose of erecting and maintaining thereon a house for public worship. But we know of no authority by which a grant declared to be for a special purpose, without other words, can be held to be on a condition. On the contrary it has always been held that such a grant does not convey a conditional estate, unless coupled with a clause for the payment of money, or the doing of some act by the grantee, on which the grant is clearly made to depend. Without some such clause, a grant for a specific purpose can be held at most only to create a trust, but not an estate on condition'' (cases cited).

(1860) *Packard v. Ames,* 16 *Gray,* 327, 328-9.

Later it was held that a grant of land to a town "for a burying place forever" is not a grant upon condition subsequent. The land was sold by the town to a school district which removed the remains of those buried there and applied the land to school purposes. The same judge said:

"A deed will not be construed to create an estate on condition unless the language is used which according to the rules of law. *ex proprio vigore,* imports a condition··········Conditions are not favored in law. If it is doubtful whether a clause in a deed be a covenant or condition, courts of law will always incline against the latter construction······"

"In the deed on which the present controversy arises, there are, strictly speaking, no words of condition, such as of themselves import the creation of a conditional estate. The usual and proper technical words by which such an estate is granted by deed are, 'provided' 'so as' or 'on condition'······"

"We believe there is no authoritative sanction for the doctrine that a deed is to be construed as a grant on a condition subsequent solely for the reason that it contains a clause declaring the purpose for which it is intended the granted premises shall be used, where such purpose will not enure specially to the benefit of the grantor and his assigns, but is in its nature general and public, and where there are no other words indicating an intent that the grant is to be void if the declared purpose is not fulfilled".

(1863) *Rawson v. Inhabitants School Dist. Uxbridge,* 7 *Allen* 125, 127-8-9-30.

See also (1871) *Sohier v. Trinity Church,* 109 *Mass.* 1.

It is clear, therefore, from the foregoing authorities that the State is free to convey the land in question for another public trust;

13

the first one having terminated. It will be noticed that Benjamin Church did not make a gift of his land to the Province. He got the equivalent for it, by getting the Wilcox land. The purpose for which the deed was made was rather the object of the Province: it devoted some of its land to aid the Indians. It is well also not to lose sight of the words, in the habendum clause, which provide that, "sd Land & premises shall from henceforth forever be and Remain at the free and absolute dispose of the Govern$^r$ & Generall Assembly of the sd Province for the time being as the Govern$^r$ & Gen$^{ll}$ Assembly may grant or dispose of any other Publique or unappropriatted land belonging to & within the sd Province······"which, no doubt were, intended to reserve in the Province, its successors or assigns the complete right of disposal, in case the land ceased to be needed for an Indian Plantation or Reservation.

In 1764, the Province of Massachusetts Bay made a partition or allotment of the land described in the Church deed, among various members of the tribe to be held in severalty.

See, *Report of John Milton Earle on Indians of the Commonwealth. Senate Document No. 96. (1861), App. C. p. 80; and plan annexed to the pamphlet containing said Sen. Doc. No. 96, State Ed. 1861.*

And also reprinted in

*Mass. House Doc. No. 215, 1862.*

The part which relates to the Fall River Indian colony, in Earle's Report, is found at pages 71 to 87 inclusive, in Mass. Senate Doc. No. 96 of 1861, as reprinted in pamphlet form.

15. The Special Report of J. M. Earle, on the claim of Zurviah Gould Mitchell of Abington, Mass., discusses generally the title of the Commonwealth, but more particularly the title of the persons among whom a division was made in 1764.

See *Special Report of J. M. Earle, on claim of Z. G. Mitchell* (1861) *post.*

It is difficult to determine whether the Commonwealth, prior to 1869, was anything more than a mere trustee for the Indians and their descendants. At any rate, it attempted to act for them, as previous colonial and provincial governments had done; it appointed guardians and granted relief to the occupants of the Indian Plantation or Reservation in Fall River, as appears more fully by the reports of the State Board of Charities, the special report to the legislature of 1849, on the Indians in the State, the Report of J. M. Earle in 1861 and the reports of the Guardian of the Fall River Indians, printed hereafter; and finally by St. 1869,

14

C. 463, it emancipated the Indians and removed all their disabilities.

16. Since it appears that many families of the original grantees in severalty under the division of 1764 have become extinct, it would seem that the Commonwealth may have acquired title by reversion or escheat to some of the lands in question.

*Mass. Rev. L. Ch.* 133 § 1

and previous statutes cited in margin running back to 1692.

17. It is provided in the Constitution of this Commonwealth that "whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor".

*Mass. Declaration of Rights, Art.* 10.

It is provided, in the substitute bill, that due compensation shall be made by the City of Fall River to persons aggrieved by the taking of the lands in question.

18. Fall River asks that so far as the State's title extends, it shall be transferred to another public corporation to be held by it under such limitations, if any, as the Commonwealth now holds under. Then the legislature is requested to authorize the city to take by eminent domain, paying whatever damages are suffered.

Formerly these lands were held in trust by the State for a small part of the people occupying them; now the State is asked that they shall be held in trust for all the people living in the vicinity, so that they may have a water supply whose purity and increased capacity shall be forever preserved from contamination.

19. In 1869 Governor Claflin made an earnest recommendation to the legislature to enfranchise the Indians residing in the Commonwealth.

See, Governor Claflin's Inaugural Address in

*Acts & Resolves* 1869, *p.* 843.

The legislature of 1869 enacted the Magna Charta of Massachusetts Indians, in consequence, in the following provisions which ended a tutelage of 249 years:

*St.* 1869, *Ch.* 463;

*"An Act to enfranchise the Indians of the Commonwealth.*

"Section 1. All Indians and people of color, heretofore known and called Indians, within this Commonwealth, are hereby made

and declared to be citizens of the Commonwealth, and entitled to all the rights, privileges and immunities, and subject to all the duties and liabilities to which citizens of this Commonwealth are entitled or subject.

"Section 2.   All lands heretofore known as Indian lands, and rightfully held by any Indian in severalty, and all such lands which have been or may be set off to any Indian, shall be and become the property of such person and his heirs in fee simple: provided, that such lands shall not be held liable to be taken upon attachment or execution for any debt or liability which existed before the passage of this act; and all Indians shall hereafter have the same rights as other citizens to take, hold, convey and transmit real estate.

"Section 3.   The judge of probate of the county in which any lands held in common belonging to any tribe of Indians may lie, except in the case of the Indians of Marshpee and Gay Head, upon the application of any member of said tribe, after notice to all parties interested and a hearing of the same, if in his opinion it is for the interest of said parties that any or all of said lands be divided, shall appoint two discreet, disinterested persons commissioners to make partition of the same, and their award, being confirmed by said court, shall be final in the premises; but if he shall adjudge that it is for the interest of said parties that the same, or a part of the same, be sold, he shall direct the said commissioners, after they shall have given such bonds as the court may require, to proceed to sell any or all of said lands, and to divide the proceeds of the same among the parties rightfully entitled thereto in proportion to their several interests therein, under the direction of the said court; and the judge of probate of the county in which any lands heretofore and now known as Indian lands, and claimed in severalty by any Indians, may lie, shall direct the said commissioners to examine and define the boundaries of the lands rightfully held by individual owners, and shall properly describe and set forth the same in writing, and such description being approved by the court shall be final in the premises; and the same, together with all deeds of partition, division or sale made by such commissioners shall be recorded in the registry of deeds in the county, and the expenses of said commissioners, including the cost of recording said deeds the same being approved by the judge of probate, shall be paid out of the treasury of the Commonwealth, the same being also approved by the governor and council.

16

"Said commissioners are authorized to sue for, collect and receive all funds belonging to or held in trust for, any tribe of Indians for which said commissioners are appointed; and all such funds shall be divided by said commissioners among the parties rightfully entitled thereto under the direction of the probate court of the county in which such tribe resides; and any property held in trust by any person for any tribe of Indians shall be sold by such person under the direction of the judge of probate, and the proceeds of such sale shall be paid over to the commissioners to be divided as aforesaid. The judge of probate of Plymouth county shall have jurisdiction over all matters relating to the Herring Pond Indians under this section.

"Any person aggrieved by any order, decree or denial of the judge of probate under this act, shall have the same right of appeal, under the same rules and regulations as provided for in chapter one hundred and seventeen of the General Statutes: provided, that the attested copies and notices required to be given by said chapter shall be served upon such parties as the judge of probate shall direct.

"Section 4.   Upon the application of the overseers of the poor, of any town, to the board of state charities, said board shall make provision in the state almshouses or elsewhere for the support of any persons heretofore known as Indians who may be unable to support themselves, and who have not acquired a settlement in any town; and upon the application of any Indian who has heretofore received aid from the Commonwealth, the said board shall furnish to such person in the state almshouses or elsewhere, such aid as they may deem expedient.

"Section 5.   The general agent of the board of state charities shall take charge of the house, and all property connected therewith, in the town of Webster, belonging to the Commonwealth, and may lease to persons heretofore known as members of the Dudley tribe of Indians, upon terms substantially like those upon which they have heretofore occupied it; or he shall, under the direction of the board of state charities, sell the same at public auction, and the proceeds of such leases or sale shall be paid into the treasury of the Commonwealth." (Approved June 23, 1869.)

20.   Previous to the foregoing statute of 1869, the Indians living in Massachusetts were subject to many civil disabilities. They were unable to buy or sell land or contract liabilities like white men.   They were in a state of pupilage.

It was stated by Putnam J. that:

"The provisions which have been adopted by the legislature, in respect of this improvident race of men, have been dictated by a single regard to their welfare. The guardian is empowered to grant license to such of them as shall by industry, sobriety and correct conduct, entitle themselves to the privilege to make contracts generally, in particular to purchase real estate."

(1840) *Thaxter v. Grinnell*, 2 *Metc.* 13, 14, 15.

The effect of the statute of 1869 was such that "it gave every Indian a right immediately to have his share of the common lands of the tribe set out to him or sold for his benefit."

Knowlton J. in

(1891) *Drew v. Carroll*, 154 *Mass.* 181, 184.

In the course of the same decision it was said:

"Having all the rights of a citizen an Indian, under this statute, could sell and control, in any way, all his interests in property whether legal or equitable, as freely as any one else".

*Ibid. p.* 183.

Referring to the same subject, Gray J. said:

"By the law of Massachusetts, until very recently, the Indians were not subject to taxation, nor endowed with the ordinary civil and political rights of citizens, but were treated as the wards of the Commonwealth; the title in the lands occupied by their tribes was in the State, and could not be alienated by them without the consent of the legislature; and the use and improvement thereof by the Indians was regulated by the legislature, from time to time, at its discretion · · · · · · · · · · · ·

"By recent legislation, the Indians of the Commonwealth have been fully enfranchised from the subjection in which they had heretofore been kept, and put upon the same footing as other citizens; and provision made for the division of their lands among them in severalty as their absolute property"; citing St. 1869 C. 463, and St. 1870, C. C. 213, 293, 350.

(1871) *Danzell v. Webquish*, 108 *Mass.* 133, 134.

It was held in the same case that the minor children of Deborah Danzell and of Mary Perry (the latter living in Fall River) not having been born, nor having ever lived upon the lands of the Herring Pond tribe of Indians (in Plymouth County) could not have a right, under St. 1869, C. 463, to a share in the division of the same; although their mother was one of the proprietors of

18

said lands and was born thereon; but after marriage she went to live in Fall River.

(1871) *Danzell v. Webquish*, 108 *Mass.* 133.

21.    Precedent for the proposed action of the legislature, in this instance, is found in the disposal of the Commonwealth's rights in the lands of the Marshpee Indians in favor of the town of Marshpee.

*St.* 1870, *C.* 293, §§ 1, 2.

The constitutionality of this statute was attacked but fully sustained by the supreme court which held, through Endicott J. that,

"There is no constitutional objection to any of these provisions. The tenure by which these lands were held was peculiar. In bestowing the privileges of citizenship upon these wards of the Commonwealth and giving a title in fee simple to all lands held by them in severalty under existing provisions of law, it was not only proper but a wise exercise of power for the legislature to frame provisions by which common lands belonging to the town or the tribe should be divided. The legislature could impose any reasonable qualifications or restrictions upon the privileges and power conferred by the statute, either upon the town or upon the people known as the Marshpee tribe of Indians".

(1879) *Darius Coombs et al, Petrs.*, 127 *Mass.* 278.

----

# HISTORY OF TITLE TO
## FALL RIVER INDIAN RESERVATION.

The lands now comprised within the territorial limits of Fall River were obtained in two parts; one from the Indians in 1659, called the "Freemen's Purchase"; and the other from the Colony of New Plymouth, in 1679-80, called the "Pocasset Purchase".

The Reservation includes the full width of the northerly quarter of the *Second Share*, and the full width of the southerly half of the *Third Share* of the Freemen's Purchase, and extends from North Watuppa Pond easterly to the Proprietor's Way, or "Head of Lots".

The Freemen's Purchase was deeded by Wamsutta and other Indians to James Cudworth and other proprietors, April 2, 1659.

19

Bk. 1, P. 361, Fall River Cop. Records; same in Bk. 3, P. 416-417
Bristol Co., No. Dist. Rec.   Same in Fenner's Hist. Fall River,
1906, p. 4-5.

---

The *Second Share* of the Freemen's Purchase was allotted to
Humphrey Turner, one of the original proprietors.   It descended
to his son Joseph Turner, who sold it to Israel Hubbard in 1671.
From him it passed to I. Hubbard and Jonathan Dodson.   History
of Bristol County, Boston History Company. 1899, p. 425.

Israel "Hubart" and Jonathan Dodson sell to Benjamin Church
the whole *Second Share* from Taunton River to Proprietor's Way
or "Head of Lots".   Bk. 1, pages 383-6, No. Dist. and Bk. 1, p.
101, F. R. Cop. Rec., give the deed as follows:

### Deed of "Hubart" and Dodson to Benj. Church.

"To all Christian People to whom these presents shall come Israel
Huberd of the town of Scittuate in the County of Plimouth in the
Province of the masachuset Bay in New England yeoman and
Jonathan Dodson of the town & County afores[d] sendeth Greeting
Know yee that we the afores[d] Israel Hubard & Jonathan Dodson
Hath for the Sum of one hundred & fifty pounds lawfull Currant
money in New England by them in hand Received, and well &
truly payd by Maj[r] Benjamin Church of Bristoll in the County of
Bristoll in the Province afores[d] wherewith the said Israel Hubard
and Jonathan Dodson Doth acknowledge themselves Sufficiently
Sattisfyed, Contented, & fully & absolutely payd and thereof & of
every part and percell thereof, They Do exonerate acquitt & fully
Discharge, the said Benjamin Church his heirs Executors Admin-
istrators & Assignes forever, Have freely and absolutely Given
granted Bargained sold Aliened Enfeoffed & Confirmed And by
these presents Doe freely Clearely fully & absolutely Give Grant
Bargain Sell Alien Enfeoffe & Confirme from them the said Israel
Hubard & said Jonathan Dodson their heires executors & Assignes
forever unto him the said Benjamin Church his heires & assignes
forever A Certaine Tract or percel of uplands Scittuate lyeing &
being in ffreetown in the County of Bristoll afores[d] being one Great
lott (so called and is the second lott from the fall River, being
Butted and Bounded, towards the south to the lott that was
somtime Timothy ffosters, but partly now in the possession of
Ralph Earle Jun[r] and toward the North to the lott y[t] was fformerly

20

Christopher wadsworth, And Buting on the Salt water or River
that leadeth up to Taunton, on the west and Runing up into the
woods Easterly as far as the other lotts Do extend: to have and to
hold the afforesaid great lott of upland (be it more or less) Scittuate
& bounded as aforesd with all & Singuler the timber wood under-
wood stones Mines Minerals water Courses Herbage grass feed-
ings Rents profits Heridittaments Immunityes priviledges & appur-
tenances thereto belonging or in any manner of way apperteineing
with the Revertion & Revertions Remainder & Remainders to him
the said Benjamin Church his heires executors and Adm$^{rs}$ And to
the only proper use & usses benefit & behooffs of him the said
Benjamin Church his heires executors Administrators & Assignes
forever, And the said Israel Hubard & the sd Jonathan Dodson
Doth hereby promise Covenat & grant to and with the sd Benjamin
Church his heires & assignes that at the time of ye sealeing &
untill the Delivery of these presents, they the said Israel Hubard
& ye sd Jonathan Dodson are true only lawfull owners of all the
above given & granted premises and that they are lawfully Seized
of & in the same in their owne proper Right And that they have
in themselves full power, Good Right, & lawfull authority to give
grant Sell Convey & assure the same unto him the sd Benjamin
Church his heires & assignes forever as a good sure perfect &
absolute estate of Inheritance in Fee Simple without any manner
of Condition or Revertion title of Dower or limmitation of usses,
whatsoever, so as to alter Chainge Defeat or make voyde the same,
And that the said Benjamin Church his heires & assignes shall &
may by force & vertue of these p$^r$sents, from time to time & at all
times Hereafter forever Lawfully Peaceably & quietly have hold
posess occupie & enjoy all & Singular the above given & Granted
premises & every part and percell thereof ffree & Cleare & Clearely
acquitted & fully Discharged of & from all, and all mann$^r$ of former
& other Gifts grants Bargaines Sales Leases Mortgag Joyntures
Dowers, Entailes, Judgments, executions, and exstents and of &
from all other titles troubles Charges & encumbrances whatsoever
had made Comitted Omitted or suffered to be Done By them the
sd Israel Hubard & Jonathan Dodson or by their privitie, or pro-
curement And farther the said Israel Hubard & the sd Jonathan
Dodson, Doth Covenant & promise to & with the said Benjamin
Church his heires & assignes that at his or their Reasonable request
and proper Charges, they the sd Hubart & Dodson will Do such
farther lawfull act & Acts, thing & things for the farther Con-
firming & sure making of all the above granted premises, unto the

said Benjamin Church his heires and assignes for ever, as by his
or their Councel Learned in the law shall be Reasonably Devized
Advized or Required In witness whereof the said Israel Hubart &
Jonathan Dodson have hereunto sett their hands & affixed their
Seales this Sixth Day of September one thousand Six hundred
Ninety four In the Sixth year of the Reigne of o$^r$ Sovereigne Lord
& Lady King will and Queen Mary It is to be understood before
signeing & sealeing and it is hereby Declared & understood, that
the abovesd Israel Hubart & Jonathan Dodson Doth sell one whole
Share of land, or their whole Right off land in the town of freetown
Conteined in & belonging to the above said lott unto the sd
Benjamin Church his heires & assignes forever

Signed sealed & Delivered

In the presence of us                    ISRAEL HUBART (Seale)

witnesses vizt.

Simon Davis                              JONATHAN DODSON (seale)

Jno. Cary

This 25th Day of february 1694-5 appeared ye abovesd Israel
Hubart and Did own & acknowledge the above written Instrument
& allso the posession written on the Backside to be his act & Deed
unto the abovesd major Benjamin Church, so far as said hubart is
Concerned in said Deed for his part  Before me John Cushen
Justice of peace for the County of Plimouth''

"This 5th day of march 1694-5 appeared Sarah Hubart, the
wife of the s$^d$ Israel Hubard & Did freely & fully Surender up all
her Right of thirds into the land above mentioned In the above
written Deed unto the aboves$^d$ maj$^e$ Benja Church before me
John Cushen Justice of Peace for ye County of Plimouth

"The above Named Jonathan Dodson acknowledged this
Instrument above written to be his act & Deed & the Posession
on the Backside at the same time this Ninth Day of march 1694-5
Befor Joseph Church Justice of ye Peace for ye County of Bristoll.
Memorandum that full and Peacable posession and Seizen was
given & Delivered by the within Named Israel Hubart & Jonathan
Dodson of all the lands within mentioned unto the within Named
Benjamin Church & his heires according to the true Intent &
meaning of the within written Deed, on the Seventh Day of
September Anno Dom. Sixteen hundred Ninety four in the presence
of us whose Names are Subscribed.

the mark of (V O)  RALPH EARLE
JAMES BURROUGHS
the mark of (2)  JOHN ALLEN''

22

Lieut. Benjamin Church sells to his son Constant Church the Southerly three fourths of the *Second Share* from Taunton River to Proprietor's Way or Head of Lots on April 12, 1707, Bk. 5, P. 214, No. Dist.; Bk. 2, Page 67, F. R. Cop. Rec.

---

The *Third Share* was allotted to Christopher (sometimes written Xopher) Wadsworth, one of the original proprietors.

The whole *Third Share* was transferred by John Wadsworth to Latham Clarke and John Wilbore. History of Bristol County, Boston History Company, 1899, p. 426.

By Agreement or Division Deed between Latham Clarke and John Wilbor, Clarke takes the South Half and Wilbore the North Half of the *Third Share*, Dec. 5, 1700. Bk. 6, pages 375-376, No. Dist.; Bk. 2, p. 248, F. R. Cop. Rec.

Latham Clarke and Ann, his wife, sell to Maj. Benjamin Church the whole South Half of the *Third Share* from Taunton River to Proprietor's Way or Head of Lots, on Dec. 20, 1700. Bk. 3, pages 291-292, No. Dist.; Bk. 1, p. 337, F. R. Cop. Rec. The deed reads as follows:

### Deed or Latham Clarke and Wife to Benjamin Church.

"To all Christian People to whom these p$^e$sents shall Come Lathum Clerk & Ann his wife of the town of Newport on Rhoad Island in y$^e$ Colony of Rhoad Island & Providence Plantations in y$^e$ Dominion of New Engld Sendeth Greeting in o$^e$ Lord God Everlasting Know Yee that y$^e$ sd Lathum Clark & Ann his wife for Divirs good & valuable Considerations them hereunto moveing Butt more Especially for & in Consideration of the sum of One Hundred & forty pounds Curr$^t$ money of New England to them in hand payd before y$_e$ Ensealeing hereof, By Maj$^e$ Benjamin Church of the town of Bristoll in the County of Bristoll in the Province of the Massachusett Bay In y$^e$ Teritory or Dominion of New England aforesd, the Receipt whereof the sd Lathum Clarke & and Ann his wife By these p$^e$sents Acknowledge & therewith fully Sattisfyed Contented & payd & thereof & Every part & p$^e$cell thereof Doe fully & Clearely Acquitt and Discharge the said Majo$^e$ Benjamin Church his heires, Executors Administrators & Every of them for Ever Have fully Clearely & absolutely Bargained, sold, Enfeoffed & Confirmed, and by these presents Doe fully clearely & absolutely Bargained sell

Enfeoffe & Confirme unto y<sup>e</sup> sd Majo<sup>e</sup> Benjamin Church his heires & Assignes for Ever  The whole halfe share of that ffreemans Lott of land in the Township of ffreetown Being the Third lott in Number so Called (which was Granted Enfeoffed & Confirmed unto the sd Lathum Clerke & unto John Wilbore of y<sup>e</sup> town of Ports- mouth on Rhoad Island aforesaid.  By John Wadsworth Dec<sup>d</sup> late of Duxbury, and is Now Equally Divided as may at Large appeare By an Agreement Muttually made and Consented unto Between them (the said Lathum Clarke & John Wilbore) Bearing date the fifth day of Decemb Anno Domini One thousand seven Hundred. The said halfe lott of land Butted & Bounded Northerly by the Divission line of said John Wilbores part of land of said lott Easterly by Lands of Tiverton Southerly by Lands of Majo<sup>e</sup> Benjamin Church Westerly by the River or salt water Which leades up to Taunton with all other lands or claime of lands Belonging to y<sup>t</sup> halfe lotte of Land Or in any place whatso Ever upon the East side of Taunton River, Belonging to the said Lathum Clarke Together with all & Singuler the wood trees timber & ffences standing lyeing & Grow- ing upon the same or any part or p<sup>e</sup>cell thereof and all Rights Liberties & Priviledges thereunto belonging or in any appertayne- ing.

To have and to hold the whole the said Halfe share of that ffreemans lott of land in the Township of ffreetown Being (the third lott in Number so called) Butting and bounding as abovesd with all other lands or claime of Lands belonging to y<sup>t</sup> halfe lott of land in any part or place whatso Ever upon the East side of Taun- ton River belonging to the said Lathum Clarke Clarke with all other the premises Liberties priviledges & appurtenances there- unto belonging or appertayneing unto Majo<sup>e</sup> Benjamin Church his heires & Assignes To his and their onely proper use Benefit & behooffe for Ever & the said Lathum Clarke & Ann his wife for themselves their heires Executors & Administ<sup>es</sup> Doe hereby Cove- nant Promise & grant to & with the said Maj<sup>e</sup> Benjamin Church his heirs and Assignes, That at & before the time of the Ensealeing hereof they the said Lathum Clarke & Ann his wife or one of them were the true and lawfull owners of the above Bargained & sold premises & Every part & p<sup>e</sup>cell thereof and have in themselves Just Right Power & Lawfull Authority To give grant Bargaine sell Convey & Assure y<sup>e</sup> same unto the said Majo<sup>e</sup> Benjamin Church his heirs & Assignes Ass a good perfect and absolute Estate of Inheiritance in ffee simple without any manner of Condition, Reversion or Limittation whatso Ever So as to Alter Chainge Defeat

24

or make voyde the same ffree & cleare & ffreely & Clearely acquitted
& Discharged, of & from all former & other gifts grants Sales
Leases Morgages Joyntures Dowers or Powers of Thirds of said
Ann & off & from all other Titles troubles Charges & Incumbrances
whatso Ever And ffurther that the said Lathum Clarke & Ann his
wife the said Bargained & sold premises unto the said Maj[e] Benja-
min Church his heire, & Assignes against themselves their heires
Executors & Administrators & Against all & Every other person
& persons Lawfully Claimeing the same or any part thereof they
Shall & will well & truely & Suffeciently warrant & for Ever Defend
by these presents And that at Any time or times hereafter upon
Demand of the sd Maj[e] Benjamin Church & at his Cost & Charges
in the Law they will Doe & perform any such further Act or Acts
for the better confirmeing & sure makeing the above Bargained &
sold premises unto him his heires and Assignes as in Law & Equity
Can be Desired & Required.

In Witness whereof the said Lathum Clarke and Ann his wife
Have sett their hands and affixed their seales this Twentieth Day
of Decemb in the Twelveth year of the Reign of his Sacred Majestie
King William the Third over England &c: AnnoqB Domini one
thousand Seven Hundred.

Signed Sealed & Delivered

In presence of us                    LATHUM CLARKE    ⟨SEALE⟩

Benj[a] Newberry

John Scot                            ANN CLARKE       ⟨SEALE⟩

Tho: ffox:

The above Named Lathum Clarke & Ann Clarke his Now wife
acknowledged this Instrument above written to be their Act and
Deed the Ninth day of January 1700
                              .70.1

Before Joseph Church one of his Majesties Justices of the
Peace for the County of Bristoll.''

In 1679-80 Daniel Wilcox is one of the original grantees of
Pocasset purchase.   Fenner's Hist. Fall River, 1906 pp. 5-6.

In March, 1701, Daniel Wilcox petitioned the General Court to
accept his land and interests in Pocasset Purchase in payment of
a fine imposed upon him in August, 1693.

November 27, 1701, Daniel Wilcox conveys to Province of
Massachusetts Bay, the 14th "Six Score Acre Lot" in Second

25

Div. Pocasset Purchase, the Second 40-Acre Lot, in Fourth Division Pocasset Purchase, and 1-30th interest in the Undivided Lands of Pocasset Purchase.    The deed is recorded in Book 3, pp. 301-2, No. Dist.; Book 1, p. 243, F. R. Cop. Rec., and reads as follows:

### Deed of Daniel Wilcox to the Province.

"To all People unto whom these presents shall Come Daniel Wilcox of Little Compton in $y^e$ County of Bristoll within his Maj$^{ties}$ Province of the Masachusett Bay in New England Yeoman sendeth Greeting Whereas the said Daniel Wilcox being at a Superior Court of Judicature Court of Assize & Generall Goal Delivery holden at Bristoll in the County of Bristoll aforesaid in the month of August Anno Domini 1693 Convicted of High misdemeanors was by the said Court sentenced to pay unto his Maj$^{ties}$ a fine of one Hundred & fifty pounds which he hath never yet payd haveing made his Escape out of the Sheiriffs hand sometime after the said sentance or Judgement was given and thereupon Removed out of the Province abovesd.    And whereas the said Daniel Wilcox being Desireous of a Peaceable Return to his ffamilie which was Removed from Little Compton aforesaid to Tiverton in the County of Bristoll aforesd Did by a Pittion presented on his behalfe by Maj$^r$ Benjamin Church unto the Generall Court or Assembly sitting at Boston in $y^e$ Province abovesd in the month of March Last past before the date hereof make a propossall that for $y^e$ Sattisfaction of the fine ordered to be payd by him as aforesd he would give a firme Deed of sale to the Province as should be Directed of the severall Tracts of land hereunder mentioned $y^t$ is to say of an one Hundred & Twenty acre lott being the fourteenth in numb$^r$ and of one forty acre lott being the second in Number as appeares on Record in the Purchassers Booke of Records in Tiverton and a Thirtyeth part or a whole share of a Tract of land that is undivided belonging to Tiverton Bounded as followeth viz$^t$ Southerly by the lands of Dartmouth west by lands of Tiverton & ffreetown & Northerly by lands of Midleborrough Extending East to a place Known by the Name of Quitticus And hath prayed that upon his the sd wilcox compleating a Deed for $y^e$ said lands he might be set at Libertie to goe home to his ffamilie & Whereas the great and Generall Court or Assembly setting in the sd month of march last in answer to the aforesd Pittion Did pass a Resolve that the Prayer therein be Granted and Appointed Ebenezer Brenton Esq$^r$ the said Maj$^r$ Benjamin Church



26

&m $^r$ william Pabodie A Committee to take Care that Suffecient Deeds of Conveyance of the severall p$^e$cells of land above mentioned be made & Executed by the sd Daniel Wilcox.

"Now these presents witness that the sd Daniel wilcox for & in Consideration of the payments & Sattisfaction of the above mentioned fine of one Hundred and fifty pounds Hath given granted Bargained sold Aliened Enfeoffed Released Conveyed & Confirmed & by these p$^r$sents Doth fully freely Clearely and absolutly give grant Bargaine sell Alien Enfeoffe Release Convey & Confirme unto the Council of his majestyes Province of the Massachusett Bay aforesaid on whom the power & Authority of the Governour of sd Province is Now Devolved (the Governor & Leu$^t$ Governor of the same being both Deceased and to the Assembly of the sd Province & to their Successers viz$^t$ the Govern$^r$ & Generall Assembly of the Province aforesaid for the time being & their Assignes for Ever   The severall percells of land herein before mentioned That is to say The aforesd one Hundred & Twenty acre lot being the fourteenth in Numb$^r$ in Tiverton aforesaid and the aforesaid forty acre lot, being the second in Number in the sd town of Tiverton Allsoe all that aforesd Thirtieth part or whole share of a tract of land that is undivided belonging to y$^e$ sd town of Tiverton and bounded as before mentioned Together with all & Singuler the Trees timberwoods underwoods waters water Courses stones fields feedings Marshes Meadows Rights menbers profitts priviledges Comodities Advantages Heridittament Emoluments & appurtenances whatso Ever upon or in any wise belonging to y$^e$ severall p$^r$cels of land herein before granted or to any or Either of them And all the Estate Right Title Interest Inheiritance use propertie possession Claime & Demand whatso Ever of him the said Daniel Wilcox and his heires of in Or to the same or any part thereof and the Revertion & Revertions Remainder & Remainders of the same To have and to hold the sd severall percells of land, & p$^r$mises herein before granted unto the Councell & Assembly of the Province of the Massachusett Bay aforesd and their Successors to witt the Govern$^r$ and Generall Assembly of the said Province for the time being their Successors & Assignes for Ever, To their use & behoofe so as that the sd lands & premises herein before granted Shall from henceforth for Ever be & remaine at the free & absolute Dispose of the Govern$^r$ Commander in Cheife & Generall Assembly for the time being of the Province aforesaid in such manner as the said Govern$^r$ or Commander in Cheife & Generall Assembly may grant or Dispose

of any other lands belonging to & within the said Province of $Y^e$ Massachusett Bay or any part thereof And the said Daniel Wilcox for himself his heires $Exe^{es}$ & $Adm^{es}$ doth hereby Covenant & Agree to & with the Councill & Assembly of $y^e$ Province aforesd their successors as aforesaid for the time being & their Assignes that he the said Daniel Wilcox is, at & until the Ensealeing & Delivery of these presents the true sole and lawfull owner of $y^e$ said Severall percells of land & premises herein before granted and hath in himself full power good Right & lawfull Authority to grant Convey & Assure the same in manner as aforesaid and that the said Granted premises are free and Cleare and Clearely Acquitted & Discharged of & from all & all manner of former & other gifts grants Bargaines sales Alinations Mortgages Leases Releases Joyntures Dowers Judgements Executions forfeitures seizures Ameniaments, Titles troubles, Charges and incumbrances whatso Ever And ffurther that he the said Daniel Wilcox his heires $Executo^{rs}$ & $Admin^{rs}$ shall & will Warrant & Defend all & Singuler the said Herein before granted premises unto the Council & Assembly of the Province aforesd their Successors as aforesaid for the time being & their Assignes for Ever Against the Lawfull Claimes & demands of all & Every person & persons whatso Ever And at their Request & at their Cost and Charges shall & will at any time or times hereafter make seale & Execute any such further Act Instrument or thing for the better Confirmation & Assurance of the said granted premises according to the true Intent & meaneing of these presents as shall be Lawfully or Reasonably Divised advised or Required.

In witness whereof the said Daniel Wilcox hath hereunto sett his hand & seale the Twenty Seventh Day of $Novemb^r$ Anno Domini 1701. AnnoqB R. Rs. Gulielmi Tertii Anglie: &c Decimo tertio:

Signed sealed & Delivered                    Signum
In presence of us                    DANIEL (I) WILCOX   (SEAL)
Ebenezer Brenton
John Mulder
Benjamin Ellery

Portsmouth on Rhoad Island $Novemb^r$ $y^e$ 27th 1701: Personally appeared the above Named Daniel Wilcox & Acknowledged the above written Instrument to be his Act and Deed & his hand and seale thereunto sett.

Before me JOSEPH SHEFFIELD Assistant''

28

On Feb. 18, 1704, the General Court of Massachusetts Bay Province assigns the above mentioned Wilcox land as a Plantation or Reservation for the Indians.

In Oct., 1707, the General Court of Province of Massachusetts Bay authorized the exchange of the Wilcox land, for land of Benjamin Church in *Second* and *Third Shares* of Freemen's Purchase, on the east side of North Watuppa Pond. (*The present Reservation*, 1907). Referred to in Deed Bk. 5, pages 506-507 No. Dist.; same in Bk. 2, page 143, F. R. Cop. Rec.

April 4, 1709, the Province of Massachusetts Bay sells to Col. Benjamin Church the above described Wilcox land: Bk. 5, pages 506-507, No. Dist., and Bk. 2, p. 143, F.R.Cop. Rec., give the deed as follows:

### Deed of Province of Massachusetts Bay to Benj. Church.

"ye seal of ye Joseph Dudley Esq[r] Capt Gen[ll] & Gov[r] in Cheife in Province of ye

Masachuset & over Her Maj[ties] Province of the Massachusett Bay in

N. E. Bay in New England in America To all to whom these presents shall come Greeting—Whereas the Great and General Court of her Majesties Province of the Masachuset Bay in New England at their Session held at Boston the eighteenth of ffeb[ry] 1704 upon application to them, before made by the Indians Resideing in the Southern parts of the County of Bristol Divers of whome have been very serviceable to ye Crown in the Late warrs with the Indians, and some of them brought up in Englesh ffamalies: viz[t] That a Conveinient Tract of land may be Assigned to them for a Plantation where they may settle together in an Orderly way and have the benefit of enjoying the Ministry & settleing a school for the teecthing & Instructing of the Children And there being a Tract of land within the Township of Tiverton lately Granted to ye Government by Daniel Wilcox. Resolved and Ordered that the sd Indians be Accomidated with a settlemt for a Plantation upon the aforesaid Lands to be holden by them of his Majesties Government with in this Province Dureing the pleasure of the Government And Ebenezer Brenton Esq[r] Maj[r] Benj[a] Church & m[r] William ffoabes are appointed to be the first Committee to Direct Order and Regulate the said settlement or Plantation in Assigneing and setting forth Due allottments or proportions of land to each ffamilye of the Indians that shall or may come to Inhabitt or settle within the said Plantation To be severally Occupied & Improved and to do all

thing Relateing to the Concerns of the said Plantation two of the
sd. Committee to Act And whereas upon further Application made
by the said Indians the said Great and General Court at their
Sessions in October 1707 upon the Report of their Committee Did
Allow of a propossal made for ye exchaingeing some of the sd lands
with Co[llo] Benjamin Church for land of his Lyeing more Comodious
for the India Settlements & more Remote from the English And
Directed that proper and Legall Instruments be Drawn accordingly
the lands to be holden of her Majesties Government of this her
Majesties Province by the said Indians and their heires forever
Yielding unto the Govern[r] of the sd Province for ye time being
upon the tenth day of December yearly One quarter of Good
Venison in Lieu of all Rents and services not to be assigned or
Alienated but Continued an Indian Plantation forever as in and by
the Courts several Records Relation being thereto had will more
fully appear Know yee therefore that wee the Gov[r] Councill and
Assembly of the Province afore[sd] Agreeable to the afore Rented
last vote And pursuant to the powers and Authorityes Contained
and Granted in and by her Majesties Royall Charter for and in
Consideration of the lands conveyed & Received on the afore
mentioned Exchainge by Deed from Coll[o] Benj[a] Church bearing
even date with these presents Have given Granted Released and
Confirmed And by these presents Do fully and absolutely give grant
Release and Confirme unto the sd Colonel Benjamin Church his heirs
and assigns forever The two several Tracts and Allottments of land
hereafter Mentioned being scittuate in the township of Tiverton
in the County of Bristoll within the Province aforesaid Granted by
Daniel Wilcox late of Little Compton within the said County of
Bristol yeoman Deceased to ye Govermt in sattisfaction of a fine
by Deed bearing date the Twenty seventh day of November One
thousand seven Hundred & One of Record in ye aforesd County
That is to say One lott being the fourteenth in Number Containing
One Hundred and Twenty acres and one other lott being the
second in Number Containing forty acres as appears on Record
in the Purchassers Book of Records in Tiverton afores[d] Together
with all & singuler the trees timber woods underwoods Right mem-
bers profits priviledges Heridittaments Emolluments Accomodations
& Appur[es] to them and each of them belonging or in any wise
Appertaining To have and to hold the said two severall Lotts of
land with the members & profits priviledges Heridittaments and
Appurtenances thereto belonging to the sd Benj[a] Church his heires
and assignes to his and their onely proper use benefit & behoof

30

forever as his and their own free absolute and proper Estate of Inherritance in ffee simple without any manner of Rent service Dues dutyes or demandes by them or any of them to be yielded Rendered or given In Testimony & Confirmation whereof the Publicke seal of the said Province of the Massachusett Bay is hereunto set and affixed Dated at Boston the fourth day of Aprill 1709 in the Eight year of the Reign of our Sovereign Lady Queen Anne of great Brittain &c

<div style="text-align:center">J DUDLEY</div>

This Instrument passed by order of the Gov.<sup>r</sup> Councill & Assembly

<div style="text-align:right">ISAAC ADDINGTON, Secretary</div>

April 4, 1709. Benjamin Church (in exchange for the Wilcox land described in last deed) conveys to the Province of Massachusetts Bay the full width of the northerly Quarter of the *Second Share* and the full width of the South Half of the *Third Share* Freemen's Purchase, from North Watuppa Pond easterly to Proprietor's Way or Head of Lots. Bk. 5, pages 488-489, No. Dist.; Bk. 2, p. 140-141. F. R. Cop. Rec. The deed reads as follows:

### Deed of Benj. Church to Province for Indians.

"To all People to whom these p<sup>r</sup>sents shall come Benjamin Church of Tiverton within the County of Bristol in her Majesties Province of the Massachuset Bay in New England in America sendeth Greeting whereas upon a proposall made to the Great and general Court or Assembly of the s<sup>d</sup> Province in favour of ye Indian Natives Resideing in ye southern parts of the s<sup>d</sup> County of Bristoll. Divers of whom have been very serviceable in the present & former Wars and some of them brought up in English families, for exchainging some of the lands formerly granted to ye Goverm<sup>t</sup> By Daniel Wilcox Yeoman since dec<sup>d</sup>. Lyeing in Tiverton, and Allowed to the Indians for a settlem<sup>t</sup> and Plantations, with the s<sup>d</sup> Coll<sup>o</sup> Church for land of his lyeing more Commodious for the Indians settlem<sup>t</sup> & more Remote from the English. The Generall Assembly at their Session in October 1707 upon the Report of their Committee appointed to View the s<sup>d</sup> lands did Allow of the said proposall and exchainge & Directed that proper and Legall Instruments be drawn accordingly the lands to be given in Exchange to be holden of her Majesties Government of ye s<sup>d</sup> Province by the s<sup>d</sup> Indians & their heires forever Yeilding to the Govern<sup>r</sup> of the s<sup>d</sup> Province for the time being upon ye tenth day of December Yearly

One quarter of good venison in Lieu of all Rents & services not to
be Assigned or Allienated but Continued an Indian Plantation for-
ever as in and the said Courts Records Relation thereunto being
had, may more fully appear.   Now Know yee that I the s$^d$ Benj$^a$
Church pursuant to the afore Recited vote and for & in Considera-
tion of the proposed exchainge viz$^t$. two lotts of land heretofore of
Daniel wilcox lyeing in Tiverton within the said County of Bristol,
by him Transffered to the Govern$^t$ & by them now passed & made
over to me by Deed bearing even date with these presents One lot No
14 Containing six score acres and the other number 2 Containing
forty acres, Have given granted Bargained sold Released enfeoffed
and confirmed and by these presents for me & my heirs Do freely
fully and absolutely give grant Release Convey and Confirm unto
Joseph Dudley Esq$^r$ Present Govern$^r$ of the Province of the Massa-
chuset Bay afores$^d$ the Councill & Assembly of the said Province
and to their successors and Assignes forever Part of the said
Benj$^a$ Church his second & Third Great lotts of land being the
easterly part of y$^m$ Lyeing scittuate in ffreetown within the County
of Bristoll afores$^d$ Measureing One Mile and a Quarter in Length
& sixty four Rods in width Containing One hundred & sixty Acres
Butted and bounded northerly on the land of John Willbore East-
erly upon Tiverton undivided lands Southerly on the land of
Constant Church and westerly on the great watupa Ponds or how-
ever other wise the same is Bounded or Reputed to be bounded
Together with all and singuler the Trees timber woods underwoods
waters water Courses Stones fields feedings Marshes Meadows
Rights members Profits Priviledges Comodityes advantages Heridi-
taments emoluments & Appur$^{ces}$ what soever upon or in any wise
belonging to the said several of land herein before granted or to
any or either of them And all the estate Right Title Interest
Inheiritance use property possession Claime and demand of me
the sd Benj$^a$ Church of in & to the same & the Reverstion &
Reverstions Remainder and Remainders thereof To have and to
hold the said lands & premises herein before granted with the
members and Appur$^{ces}$ thereof to the sd Govern$^r$ Councill &
assembly of the Province aforesd for the time being their succes-
sors and Assignes forever so as that the sd Land & premises shall
from hence forth forever be and Remain at the free and absolute
dispose of the Govern$^r$ & Generall Assembly of the sd Province for
the time being as the Govern$^r$ and Gen$^{ll}$ Assembly may grant or
dispose of any other Publique or unappropriatted land belonging to
& within the sd Province of the Massachuset Bay, But allways

32

to be Continued & used for a plantation & settlement for the Indian Natives And I the said Benj[a] Church for me my heires executors & Adm[r] Do Covenant Grant and Agree to & with the sd Govern[r] & General Assembly for the time being their successors & Assignes to warrant and defend the said land & premises with the members and appurtenances thereof unto them against the Lawfull Claime and Demand of all and every person & persons whomsoever   In Wittness whereof I the said Benjamin Church have hereunto sett my hand and seal the fourth day of April 1709 In the eighth year of the Reign of our Sovereign Lady Queen Anne.

Signed sealed and Delivered           BENJA CHURCH (Seal)

In the presence of us

Benjamin Dyer

Thomas Maccarty

"Suffolk ss—Boston Aprill ye 4th 1709   The within named Benj[a] Church p[e]sonally appearing before me ye subscriber One of her Majesties Justices of the Peace Acknowledged the within and above written Instrum[t] to be his Act and Deed

ISAAC ADDINTON."

EXHIBIT F

Payment of loan

terms and conditions as it may deem proper. The said town at the time of authorizing said loan shall provide, by vote, for the payment thereof in such annual proportionate payments, beginning not more than five years after the date of the securities issued therefor, as will extinguish the same within thirty years from the date of issue of said bonds, and when a vote to that effect has been passed the amount required thereby shall, without further vote, be assessed by the assessors of said town in each year thereafter, in the same manner in which other taxes are assessed under the provisions of section thirty-seven of chapter twelve of the Revised Laws, until the debt incurred by said loan is extinguished.

SECTION 2. This act shall take effect upon its passage.

*Approved June 12, 1907.*

*Chap.*493 AN ACT RELATIVE TO THE WATER SUPPLY OF THE CITY OF FALL RIVER.

*Be it enacted, etc., as follows:*

The city of Fall River may take certain lands for protecting its water supply, etc.

SECTION 1. Whereas certain lands situate in Fall River, in a section called Indian Town, lying on the easterly side of North Watuppa pond, were conveyed to the province of Massachusetts Bay to be held as an Indian plantation or reservation to the use and occupancy of Indians; and whereas the Commonwealth of Massachusetts has succeeded to the rights and title of the province of the Massachusetts Bay in said lands and may have obtained title to some part thereof by escheat or otherwise; and whereas there are apparently no Indians left on the same, except one family, alleging themselves to be such, namely, the family of Fanny L. Perry, occupying a small part of the land of said reservation; and whereas it is necessary that a part of said Indian reservation be owned and controlled by the city of Fall River for the protection of its water supply, now taken from said North Watuppa pond; it is hereby enacted that the title of the Commonwealth to the parcel of Indian reservation near said pond, and hereafter described be, and the same is, hereby conveyed to the city of Fall River for the protection of the purity of its water supply, namely, a certain tract of land situate in Fall River, in the county of Bristol, bounded and described as follows: — Beginning at a

drill hole in a stone bound set in the ground in the southerly line of Indian Town road, nineteen hundred and nineteen and thirty-seven one hundredths feet easterly from the intersection of said southerly line of Indian Town road with the easterly line of Blossom road; thence running in a southerly direction to a drill hole in a stone bound set in the ground at the northeasterly corner of land of the city of Fall River, recently purchased from Alfred Bridge; thence westerly in line of land of the city of Fall River to land of the city of Fall River and the North Watuppa pond; thence northerly by land of the city of Fall River and said pond to the northerly line of the land of said Indian reservation; thence easterly in said northerly line to the Indian Town road; thence to the point of beginning, containing one hundred and one and seven tenths acres of land, more or less, exclusive of highways crossing said tract.

SECTION 2.   The city of Fall River may take in fee simple, by right of eminent domain, the lands above described forming a part of the Indian reservation, for the protection of its water supply, in North Watuppa pond; and if upon a vote of its reservoir commission or of its city council it decides so to do, then it may file and record a statement of such taking in the office of the registry of deeds, in the Fall River district of the county of Bristol, giving a description of the land taken; and may also file a plan of the same, both such statement and plan being duly signed by its mayor; and when such statement and plan are duly signed, filed and recorded as aforesaid, then said described lands shall become and remain the property of the city of Fall River, in fee simple. *Description of lands taken to be recorded*

SECTION 3.   Any one aggrieved, or entitled to damages, by reason of anything done or authorized by this act may recover the same from the city of Fall River, by filing a petition in the superior court for the county of Bristol, within one year after the date of taking aforesaid.   The said damages shall be assessed in the same manner as in the case of land taken for the protection of the water supply of Fall River, as provided in section four of chapter one hundred and fourteen of the acts of the year eighteen hundred and ninety-one, but all sums received by the petitioners or predecessors in title from the Commonwealth or from said city in the way of Indian or *Damages, etc.*

other relief; the obligations placed upon said city by section four of this act, or by the general laws relative to the granting of relief, or otherwise applicable to the petitioners; the non-payment of taxes by the petitioners or predecessors in title, or their failure to discharge public obligations or to participate in the support or maintenance of city, county, state or national governments or to contribute to the state whatever was required in any deed relating to said lands, and all other easements, conditions, water and flowage rights connected with said lands, the occupancy or use of said lands, and whatever other matters may be allowed by way of set off, recoupment, counterclaim or in mitigation of damages, shall be allowed in reduction of damages for the taking of the lands aforesaid. Interest on the sums recovered, at the rate of four per cent per annum, shall run only from the date of the taking; but in case of occupancy after the taking, such interest shall run only from the termination of such occupancy.

The city to discharge certain duties of the Commonwealth, etc.

SECTION 4. The city of Fall River, its successors or assigns, shall maintain and discharge toward the present rightful occupants of the land conveyed or taken as aforesaid all duties that the Commonwealth is lawfully required to perform as the successor of the province of Massachusetts Bay. But said city, if it take the land before described, and if it decide, hereafter, that the houses or other buildings on the parts herein conveyed and authorized to be taken should be removed to a place beyond the area deemed necessary for the protection of the purity of its water supply, shall remove such buildings and all persons thereon and their chattels, at its expense, to such other part of said Indian reservation as may be without such area, and shall make suitable provision in the same buildings or in similar buildings to be used by said occupants for a comfortable dwelling therein, and for safe and reasonable means of access thereto from the highway.

SECTION 5. This act shall take effect upon its passage.

*Approved June 12, 1907.*

Book No. 127.

503

A TRUE COPY OF INSTRUMENT AS RECORDED IN BRISTOL COUNTY
FALL RIVER REGISTRY OF DEEDS IN BOOK 127 PAGE 501 - 503
ATTEST:

Bernard J McDonald III

REGISTER



Case 1:05-cv-...66-DPW    Document 1-4    Filed 07/05/2005    Page 6 of 21

EXHIBIT I (1)

# Indians Demand Return Of Reservation Land

The return of Watuppa Reservation land to the Wampanoag Indians is among the demands which will be presented Thursday in Plymouth by members of the American Indian Movement who have designated Thanksgiving Day as a day of mourning for the decline of their people.

Miss Rayleen Bay, spokesman for the United Indians of New England, said Monday at Boston University that the gathering of Indians from tribes throughout North America is to create awareness of the American Indian, demonstrate unity and provide a forum for the Indians.

The remains of the Watuppa Reservation were taken from the Indians by the City of Fall River through eminent domain in 1907. The Indians claim they were not paid for the land which is on the shores of North Watuppa Pond.

The land in question, about 100 acres, was taken to protect the city's water supply. It was part of 200 acres of the Massachusetts Indian Reservation, which was granted to the Wampanoags for use as long as their descendents remained there.

At that time, only one Indian family, a widow and her four children, remained on the land. The 1907 article, which listed the value of the land at $5,000-$10,000, made no mention of what became of Mrs. Fannie L. Perry and her children.

In 1938, Josephus Perry of Freetown and a nephew of Mrs. Perry, filed a bill claiming the land for descendents of the Pocasset branch of the Wampanoags in return for lands which were taken in 1907.

The question was whether the land had been taken from the rightful owners, or whether the Indians had long ago relinquished claim of ownership through sale of the land to settlers in 1659.

According to Perry's statement, "Many of the decendents of this Indian tribe, at the time of the taking by eminent domain, were ignorant of this taking by the city . . . and thus lost their rights to said reservation and have never received compensation."

Today about 95 acres, called the "Promised Land" by the Indians, remain designated for use as an Indian reservation, according to John Boardman, city forester.

"The watershed, known as Watuppa Reservation, is not the true reservation, but a lot of Indians, close to 200, are buried there," said Boardman.

Two women, members of the Perry family, still live on Indian Town Road, the area Boardman refers to as the true reservation.

He said that history books are contradictory about ownership of the land, but it is his understanding that the Indians were given the right to use the land as long as their descendents remain on it.

Several Indians were born and raised on Blossom Road, said Boardman, who can remember several houses which once stood there. These people were wards of the state, he added.

Joseph Rego, water registrar, said Tuesday no representatives of the organized Indian group have presented their demands to the city.

The New England I are also demanding cont the Schaghticoke Indian vation in Connecticut an institution of Indian stud the school systems of the try.

More than 1,000 Indian expected to attend the Plym Rock demonstration, said Bay.



PLAINTIFF, CORLISS, IS 2ND ROW FROM LEFT — IMMEDIATELY TO HIS LEFT IS MAURICE FOX (MASS. COMMISSIONER INDIAN AFFAIRS)

0525308

# CERTIFICATE OF TITLE

## THE COMMONWEALTH OF MASSACHUSETTS

| TITLE NUMBER | VEHICLE IDENTIFICATION NUMBER | | DATE OF ISSUE |
|---|---|---|---|
| AK018348 | 1N6ND1652JC400504 | | 06/11/93 |

| MFRS. MODEL YEAR | MAKE | MODEL NAME | MODEL NO. | BODY STYLE/TYPE | NEW/USED |
|---|---|---|---|---|---|
| 1988 | NISS | D21 USKING | PU | U |

| CYL. PASS. DRS. | PURCHASE DATE | ODOMETER READING | PREV. TITLE NO. | PREV. TITLE STATE |
|---|---|---|---|---|
| 04 02 2 | 05/19/93 | 92,878 | | |

ACTUAL MILEAGE

NAME AND ADDRESS OF VEHICLE OWNER(S)

CORLISS, ALBERT H
72 MILK STREET
ABINGTON, MA 02351

FIRST LIENHOLDER

SECOND LIENHOLDER

RELEASE OF LIEN
THE LIEN HOLDER'S INTEREST IN THE VEHICLE DESCRIBED IN THIS CERTIFICATE IS HEREBY RELEASED.

NAME _____ DATE RELEASED _____ AUTHORIZED SIGNATURE _____

NAME _____ DATE RELEASED _____ AUTHORIZED SIGNATURE _____

THE REGISTRAR OF MOTOR VEHICLES HEREBY CERTIFIES THAT AN APPLICATION FOR A CERTIFICATE OF TITLE FOR THE MOTOR VEHICLE DESCRIBED HEREIN HAS BEEN DULY FILED, PURSUANT TO THE PROVISIONS OF THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, AND BASED ON THE STATEMENTS OF THE APPLICANT AND THE RECORDS ON FILE WITH THIS AGENCY, THE APPLICANT NAMED IS THE OWNER OF SAID VEHICLE.

THE REGISTRAR OF MOTOR VEHICLES FURTHER CERTIFIES THAT THE VEHICLE IS SUBJECT TO ANY SECURITY INTERESTS SHOWN HEREIN.

JEROLD A. GNAZZO
REGISTRAR

VOID IF ALTERED

# *Levesque's Auto Service, Inc.* ⬤ **RoadOne** COMPANY

## NOTICE TO OWNER
## (G.L.chap.255sec.39A)

**To:** *Albert Corless*
*1514 Beacon St*
*Brookline, Ma.*

**Vehicle Description:** *1988 Nissan P/u Red*
**Registration #** *NONE*

As a request from the *Fall River* Police Department on *5-3-01* your above described vehicle was towed from _____, and was ordered towed to: *U*

**LEVESQUE'S AUTO SERVICE, INC.**
**771 RODMAN ST.**
**FAL RIVER, MA 02721**
**PHONE: 508-676-8401**

The towing charge was $75.00 and there may be other applicable charges related to this tow. The storage rate for this vehicle is $20.00 per day, beginning *5-3-01* and continuing at the rate of $20.00 per day. Please advise if we are to continue to hold your vehicle subject to the above stated storage rates.

**Signed:** *LEVESQUE'S ROADONE*

### Massachusetts General Laws Chap.90,Sec.22B
### Chap.90, Sec.22B – Abandonment of Motor Vehicles; Penalties

Whoever abandons a motor vehicle registered or unregistered, upon any public or private way or upon any property other than his own without the permission of the owner or lessee of said property shall be punished by a fine of not less than one hundred, no more than five hundred dollars. A conviction of a violation of this section shall be reported forthwith by the court to the registrar, who may revoke, for a period not exceeding three months, the license of the person so convicted , and if the motor vehicle is registered in his name or was last registered in his name, he shall be prohibited from registering another motor vehicle for one year, and no appeal, motion for new trial or exceptions shall operate to stay the revocation of the license or the prohibition of registration.

Amended by St.1973, C.290

# Levesque's Auto Service, Inc. 🔁 Ⓐ RoadOne COMPANY

## NOTICE TO OWNER
### (G.L.chap.255sec.39A)

To: **Albert Corless**

Vehicle Description: **1988 NISSAN**
Registration #

As a request from the **Fall River** Police Department on **050301** your above described vehicle was towed
from **Indian Town Rd**    , and was ordered towed to:

> LEVESQUE'S AUTO SERVICE, INC.
> 771 RODMAN ST.
> FAL RIVER, MA 02721
> PHONE: 508-676-8401

The towing charge was $75.00 and there may be other applicable charges related to this tow. The storage rate for
this vehicle is $20.00 per day, beginning **05030** and continuing at the rate of $20.00 per day. Please advise if we
are to continue to hold your vehicle subject to the above stated storage rates.

Signed: *LEVESQUE'S ROADONE*

Massachusetts General Laws Chap.90,Sec.22B
Chap.90, Sec.22B – Abandonment of Motor Vehicles; Penalties

Whoever abandons a motor vehicle registered or unregistered, upon any public or private way or upon any
property other than his own without the permission of the owner or lessee of said property shall be punished by a
fine of not less than one hundred, no more than five hundred dollars. A conviction of a violation of this section
shall be reported forthwith by the court to the registrar, who may revoke, for a period not exceeding three months
the license of the person so convicted , and if the motor vehicle is registered in his name or was last registered in
his name, he shall be prohibited from registering another motor vehicle for one year, and no appeal, motion for
new trial or exceptions shall operate to stay the revocation of the license or the prohibition of registration.

Amended by St.1973, C.290

EXHIBIT L

Albert H. Corliss, Esq.                                    December 26, 2001
1514 Beacon Street, Suite 43
Brookline, MA 02446
(617) 731-1309

Levesque Auto Service, Inc.
771 Rodman Street
Fall River, MA 02721-4241

Re: CONVERSION (Trespass to Chattel)
    1988 Nissan "taken" from Indian Reservation in April/May 2001

Dear Sirs:

Enclosed please find copies of two (2) certified letters sent to my offices. (First, dated
June 30, 2001 and the Second, a month later?) I am sure you know or should know that
the law requires three (3)sequential certified letters be sent to the owner to qualify as
"Notice", however, that being said, I desire at this time to exercise my legal options and
protections.

My position is this: The vehicle you improperly and illegally towed belonged (belongs)
to myself. (1998 Nissan) pick-up.) It was legally parked, not in any way abandoned, on
Indian Reservation Land (275 Indian Town road, Fall River, MA. and given to the local
Indians in 1709.) Wherefore, it is specious to claim it was on "any public or private way".

I, Albert H. Corliss, am the Council Chairman of the Nemasket and Troy Indian Tribe,
the tribe which legally controls the aforementioned Reservation land, and the Council
(legal government for the reservation known to the Indians as "Watuppa") gave me
permission to park my vehicle there. (Documents available per request of the Court)

Neither yourself nor any company nor any other individual nor the local police nor the
Fall River Water Commission nor the Mass D.E.M.. has (Had) the jurisdiction to enter this
property. If you did so you are also subject to trespass charges which will be brought by
the tribal Council and enforced by the Bristol County D.A. (According to 19th century
law still in effect.)

In the meantime I allege you are guilty of the offense of "Conversion" in that your
interference to my right of possession was so SERIOUS as to warrant that you pay the full
value of the chattel (vehicle.) or Fifteen Hundred Dollars ($1500). If you do so,
forthwith, that will be the end of the matter. I thank you in advance. (If not please
respond IN WRITING)

Very truly yours,

Albert H. Corliss

**EXHIBIT M**

FALL RIVER POLICE DEPARTMENT
AUTO REMOVAL FORM

DATE 05/03/2001          TIME 3:10 PM   TOW #          CASE #

( ) Auto Accident  ( ) Stolen Auto  ( ) Abandoned  (X) Other _Marked_   Specify

REG.# MSS3468          VIN# 1N4DL01C02502502          STATE MA

MAKE Nissan     YEAR 2010   MODEL Maxima          COLOR Red

OWNER NOTIFIED

( ) YES
(X) NO     If not, state why

OWNER _____   ADDRESS _____   TEL.# _____

Person requesting removal _____   _____   _____
                          NAME      ADDRESS

LOCATION OF VEHICLE TO BE REMOVED _____   _____
                                  NAME      ADDRESS

PERSON REMOVING VEHICLE _____
                        Name or Company   Address

LOCATION OF VEHICLE _____   TOWING CHARGE _____
TOWED OR STORED   Company   Address   STORAGE CHARGE _____

REMOVAL AUTHORIZED _____   _____
                   NAME        RANK

OFFICER MAKING REPORT _____



EXHIBIT N

**Top receipt (customer copy):**

AMERICAN
PORT MA 02790

SOLD TO:

DELIVERY ADDRESS

ACCOUNT #
INVOICE #
DELIVERY DATE  9-28-0
ESTIMATED O.D.
LAST O.D.
SERIAL #

| PRODUCT CODE | QUANTITY | PRICE | FEDERAL | STATE | LOCAL | AMOUNT |
|---|---|---|---|---|---|---|
| | | | | | | 63 84 |

SEE REVERSE SIDE FOR IMPORTANT SAFETY AND CONSUMER INFORMATION.
GALLONS DELIVERED AUTOMATICALLY COMPENSATED TO 60°F.

SUB TOTAL

STATE AND LOCAL SALES OR USE TAX   %

☐ CASH   NO-LPG-120   UN1075
☐ CHECK  FLAMMABLE COMPRESSED GAS
PROPANE

**TOTAL →** 66 67

CUSTOMER COPY   *Thank You For Your Business!*

☐ CHARGE       ☒ DOMESTIC
☐ COLLECTION   ☐ COMMERCIAL
☐ NON-BILLED DELIVERY   ☐ SPECIAL
TERMS: Payment is due upon   ☐ METER
receipt. Past due accounts are   ☐ JOBBER
subject to a late charge.   ☐ MOTOR FUEL

TANK READING   METER READING
CAPACITY
PROPANE POUNDS   CYLINDERS RETURNED   DELIVERED

**Check:**

ALBERT H. CORLISS   FOR SEASONS   5-7515/110
1514 BEACON ST., #43        6290000523317
BROOKLINE, MA 02446
(617) 731-1309                          566

Pay to the order of  HANNS SOUTHEASTERN PROPANE   $ 66 67

SIXTY-SIX AND 67/100

Sovereign   275 Indian Town Rd.
            No. Westport, MA

#1678682   WATUPPA INDIAN

⑆011075150⑆ 629000523 17⑈ 0566

ACCOUNT 6201225

**Bottom receipt (customer remittance copy):**

HANNS SOUTHEASTERN PROPANE
795 AMERICAN LEGION HWY
WESTPORT, MA 02790-0697

SOLD TO: 09/20/00

DELIVERY ADDRESS

BARBARA STEVENS
275 INDIAN TOWN RD
NO WESTPORT MA
02790

275 INDIAN TOWN RD
NO WESTPORT MA

DELIVERY: LP FOR COOKING
INSTRUCTIONS

ACCOUNT BALANCE   $0.00

| PRODUCT CODE | QUANTITY | PRICE | FEDERAL | STATE | LOCAL | AMOUNT |
|---|---|---|---|---|---|---|
| 12 | | 1.7490 | | | | 63 84 |
| Environmental Reg Fee | | | | | 2 83 | |

SEE REVERSE SIDE FOR IMPORTANT SAFETY AND CONSUMER INFORMATION.
GALLONS DELIVERED AUTOMATICALLY COMPENSATED TO 60°F.

SUB TOTAL

COUNTY   STATE AND LOCAL SALES OR USE TAX

☐ CASH   NO-LPG-120   UN1075
☐ CHECK  FLAMMABLE COMPRESSED GAS
PROPANE

**TOTAL →**

CUSTOMER REMITTANCE COPY   *Thank You For Your Business!*

ROUTE
ACCOUNT #
INVOICE #
DELIVERY DATE
ESTIMATED O.D.
LAST O.D.
SERIAL #

TANK READING   METER READING
CAPACITY
PROPANE POUNDS   CYLINDERS RETURNED   DELIVERED

EXHIBIT O

## COUNCIL VOTE

## WATUPPA RESERVATION - DEC. 9, 2000

We, the legitimate Council and rightful heirs of Watuppa and Betty's Neck Indian Reservations, mandated by unanimous tribal vote (Seaconke - May 7, 1999) and having fulfilled our mandate and beginning our tribal roles now wish to be called, known, recognized, etc. in all endeavors, including but not limited to, our Constitution and its amendments (July 6, 2000) henceforth by our ancestral tribal names... the Troy Nemasket Nation (TNN) or Nemasket-Troy Tribe (NTT). *~~~~ ( Nemasket & Troy Wampanoag*

Council:

Chairman Albert "Seafoam" Corliss

Dolores "No Horses" LeClaire

Donna "Words" Mitchell

Don "Standing Bear" Palardy

Joe "Many Colors" Frenier

Mark "Talks Thunder" Choquet

(*Excused absence- Barbara Stevens)

EXHIBIT P

USDA
UNITED STATES
DEPARTMENT OF
AGRICULTURE

RURAL DEVELOPMENT
WWW.RURDEV.USDA.GOV

Amherst MA 01002-2
Voice  (413) 253-4300
Fax  (413) 253-4347
TDD  (413) 2637088

March 1, 2001

**To:**  Administrator, RUS          Fax 202-720-0810
Attn: Assistant Administrator
Telecommunications Program
STOP 1590, Room 4056-S
Washington, DC

**From:**  William C. Gouzounis
Acting State Director, Community & Business Programs
Amherst, MA  (MA, CT & RI)

**Subject:**  Nemaske & Troy Wampanoag [Indian Tribe]
Distance Learning & Telemedicine Grant Application
Fiscal Year 2001

The Nemasket & Troy Wampanoag [Indian Tribe] (Tribe) submitted a DLT Grant application directly to the RUS National Office at some point towards the end of January, in accordance with RUS Instruction 1703, Section 1703.128(a); and, the Federal Register notice published on 11/2/00 at Volume 65, No. 215, Page 66523. We received a copy on 01/31/01, and confirmed with the applicant (Albert Corliss) that an application had been sent to your office. We have not received any correspondence from the applicant or RUS National Office to indicate that the application was reviewed. Anticipating a need, this memorandum will serve as documentation of consultation with the Massachusetts State Office, in accordance with RUS 1703, Section 1703.125(m).

This office has had a number of consultations with Mr. Corliss, as representative of the Tribe, in preparation for this application. Our consultations concerned tribal and reservation status, rural area and rurality status, eligible purposes and the Tribe's finances. There was an attempt to involve the regional Point of Contact; however, Mr. Corliss evidently had difficulty in obtaining direct contact.

The Tribe is characterized as still in an organization phase, and does not have a regular staff. Finances are limited. As such, its ability to pursue and attract sources of financing are limited. We believe that the Tribe has made a due diligence effort to secure appropriate sources of alternative funding, before seeking this grant from RUS. We do not believe that the situation is limiting to the ability of the applicant to administer a DLT grant.

Our State Strategic Plan (Massachusetts) has objectives to promote the use of the internet as a tool in rural development, and specifically targets activity to originate DLT program assistance in certain areas; Indian Tribes being identified as target areas. The Plan also calls for increasing our overall assistance to Indian Tribes. We, therefore, encouraged this application.

This application is recommended, and we ask that it receive favorable review.

cc: Rural Development Coordinator - Amherst, MA
Rural Development Manager - Wareham, MA

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, Room 326-W, Whitten Building,
14th and Independence Avenue, SW, Washington, D.C.  20250-9410, or call 202-720-5964 (voice or TDD).
USDA is an equal opportunity provider and employer

Albert H. Corliss, Esq.                                         March 24, 2001
Council Chairman
   Nemasket and Troy Wampanoag (of Wattuppa)
1514 Beacon Street, Suite 43
Brookline, MA 02446
(617) 731-1309

City Council of the
   City of Fall River
One Government Center
Fall River, MA 02722

> Re: Proposal of the Nemasket and Troy Wampanoag (Indian tribes)
>      Request for 50' (fifty foot) "right of way" (near 275 Indian Town Road)
>      Connecting Watuppa Reservation (90+ acres) over lands taken (1907)

Dear Sirs:

In 1709 Benj. Church deeded to the local Indians 200 acres "But always to be Continued & used for a plantation & settlement for the Indian Natives." (Exhibit A - 1709 Deed) In 1907 the City, with state approval, took half of the reservation "for protection of her water supply." (Exhibit B - 1907 Acts - 3 pages) Please notice on page 454 City's promise to "make suitable provisions etc... for safe and reasonable means of access thereto from the highway." See: Exhibit C - indicates half of Reservation "taken".

That the Tribe (Under Council Chairman Corliss's suit) is currently in Mass. Land Court challenging the legality of the aforementioned transaction, for allegedly no compensation "just or otherwise", as required, was paid to any Indian, is no secret. But that is not our concern today. Today, the long suffering tribe asks only that the City of Fall River honor her promise: "To provide 'reasonable access' to the reservation."

Today the Tribe (Nemasket and Tory) which has continuously held council and other governmental, religious and social functions on Watuppa Reservation, at the so-called "Perry Farm", (Exhibit D - August 3, 2000 - Council Mandate - Grant requests and Exhibit E - Dec 4, 2000 - Return to ancestral names) and is the only tribe that legally may do so, is desirous, for the betterment and advancement of its people, to take advantage of federal governmental programs such as grants, loans and other entitlements because of its status an Indian tribe located on an Indian reservation.

We are particularly interested in a "Distance Learning and Telemedicine Grant" from the US Dept. of Agriculture. (Exhibit F). Especially, when in our area there is an enormous amount of Indians elders without health care and without health services. (See: Exhibit G - 1990 Indian Elders map). We feel we stand a good chance at this grant which would provide the "bricks and sticks" (building, computers, etc.) enabling

us to provide an integrated (from records to prevention to actual treatment) Indian health care system. To do so we must utilize the "back" 90 or so acres of our Watuppa Reservation. (See: Exhibit H - Included 50' Right of Way - "Watuppa Way.")

We have enclosed a plan for a basic road (paved 24' wide) to allow safe ingress and egress. (Exhibit I - Road plans for example only)  All construction costs and maintenance, etc. of said "Right of Way" to the responsibility of the Nemasket and Troy Tribe.

The Tribe feels that this is a propitious opportunity for the Indian and the City of Fall River. A time to work together. Long have the "hard feelings" over the lost of our "Promised Lands" (See: Exhibit J - 1970 unnamed newspaper article) festered among the Indian and long has the City of Fall River remained in "denial". The City is not using the property and the argument that it is being held to "protect the water supply" is clearly specious. (Besides, the City willfully granted an easement to the Electric Company, for profit, over similar lands, much closer to the water, in the 60's.) There appears to be no down-side. And soon the City will be giving up control of the land in question under the proposed "Bio-Reserve" Project. And adding more insult to the Indian,  control of their former land will be handed over to a private group misnamed the "Trustee's of Reservations." (An oxymoron?) Now, is the time to "right old wrongs... and move on." A small measure of redemption?

Neither federal nor state nor any governmental agency has ever spent a cent for the development (housing, employment opportunities, health care, etc) of this particular Indian reservation (one of the first and therefore oldest in the country)... and the problem is reflected nationwise. (See: Exhibit K). It is a National disgrace. But we can and SHOULD do something about it. And forthwith!

We thank the City Council and the Mayor in advance and stand ready to meet, discuss, explain or answer any questions they may have. May The Spirit Bless this proposal.

Very truly yours,

Albert H. Corliss, "Seafoam"
Council Chairman
  Nemasket and Troy Wampanoag

cc
Governor Argeo Paul Cellucci, State House, Rm 360, Boston, MA 02133
Commission on Indian Affairs, DHCD, One Congress Street, 10th Fl, Boston, MA 02114
Att: Executive Director John Peters, Jr.

EXHIBIT R



**ALAN LeBOVIDGE**
COMMISSIONER

**KEVIN W. BROWN**
GENERAL COUNSEL

*The Commonwealth of Massachusetts*
*Department of Revenue*
*Disclosure and Administrative Law Unit*
*100 Cambridge Street, Boston, MA 02114*
*P.O. Box 9563*
*Boston, MA  02114-9563*

February 15, 2005

Mr. Albert H. Corliss
1514 Beacon Street, Suite 43
Brookline, MA  02446

Re:  Records Request

Dear Mr. Corliss:

    Your letter of February 8, 2005 to the Massachusetts Department of Revenue Legal Division has been referred to me for response.

    In your letter you mentioned Watuppa Indian Reservation.  Please be advised that the Department of Revenue has no record of a taxpayer by that name.  If you are interested in property tax information relating to the reservation, you may wish to contact the Board of Assessors in Fall River.

Yours very truly,

Audrey G. Rushton
Director
Disclosure and Administrative Law Unit

Doc # 187586

## EXTERIOR INFORMATION
Type |2 - CONVENT'NL
Sty Ht |1T - 1T
(Liv) Units: 1 | Total: 1
Foundation: 3 - BRICK/STONE
Frame: 1 - WOOD
Prim Wall: 01 - WOOD SHNG
Sec Wall: | %
Roof Struct: 1 - GABLE
Roof Cover: 01 - ASPHALT SH
Color:
View / Desir:

## GENERAL INFORMATION
Grade: C - AVERAGE
Year Blt: 1900 | Eff Yr Blt:
Alt LUC: | Alt %:
Jurisdict: | Fact: 0
Const Mod:
Lump Sum Adj:

## INTERIOR INFORMATION
Avg Ht/FL: STD
Prim Int Wall 1 - DRYWALL
Sec Int Wall
Partition: T - TYPICAL
Prim Floors: 05 - LINO/VINYL
Sec Floors:
Bsmt Flr 12 - CONCRETE
Bsmt Gar:
Electric: 3 - TYPICAL
Insulation: 2 - TYPICAL
Int vs Ext: S
Heat Fuel: 1 - OIL
Heat Type: 12 - FLOOR FURN
# Heat Sys: 1
% Heated: 100 | % AC:
Solar HW: NO | Central Vac: NO
% Com Wall | % Sprinkled

## BATH FEATURES
| Full Bath: 1 | Rating: AVERAGE |
| A Bath: | Rating: |
| 3/4 Bath: | Rating: |
| A.3QBth | Rating: |
| 1/2 Bath | Rating: |
| A HBth: | Rating: |
| OthrFix: | Rating: |

## OTHER FEATURES
| Kits: 1 | Rating: AVERAGE |
| A Kits: | Rating: |
| Frpl: | Rating: |
| WSFlue: | Rating: |

## CONDO INFORMATION
Location:
Unit #:
Floor:
% Own:
Name:

## DEPRECIATION
Phys Cond: AV - Average | %
Functional: | %
Economic: | %
Special: | %
Override: | %
Total: 26 %

## CALC SUMMARY
Basic: $ / SQ: 71.00
Size Adj: 1.23182
Const Adj: 0.970103
Adj $ / SQ: 84.844
Grade Factor: 1.00
Other Features: 3000
Neighborhood Inf: 1
LUC Factor: 1.00
Adj Total: 117194
Depreciation: 30470
Depreciated Total: 86724

## COMMENTS

## SKETCH



| 5 STG (25) |
| 6 |
| 11 |
| 30 |
| EF8 (24) |
| 4 |
| 22 |
| 24 |

TOS
FFL
BMT (660)

## RESIDENTIAL GRID
1st Res Grid | Desc: line 1
Level | FY LR DR D K FR RR BR FB HB L O | # Units 1
Other
Upper
Lvl 2
Lvl 1
Lower
Totals | Rms: 8 | BRs: 3 | Baths: 1 | HB

## RES BREAKDOWN
No Unit | RMS | BRS: 3 | FL
| 1 | 8 | 3 |
Totals | 1 | 8 | 3

## REMODELING
| Exterior: | % |
| Interior: | % |
| Additions: | % |
| Kitchen: | % |
| Baths: | % |
| Plumbing: | % |
| Electric: | % |
| Heating: | % |
| General: | % |

## COMPARABLE SALES
Rate: | Parcel ID | Typ | Date: | Sale Price

WA/$/SQ: | AvRate: | Indl Val |
Juris. Factor: | Val/Sur Fin: 72.97979797
Special Features: 0 | Val/Sur Net: 45.70374275
Final Total: 86700 | Val/Su Sz/Adj: 72.97979797

## SUB AREA
| Code | Description | Area - SQ | Rate - AV | Undepr Value |
|---|---|---|---|---|
| BMT | BASEMENT | 660 | 18.670 | 12,319 |
| FFL | 1ST FLOOR | 660 | 84.840 | 55,997 |
| TOS | 3/4 STORY | 528 | 84.840 | 44,798 |
| STG | STORAGE | 25 | 10.350 | 259 |
| EFP | ENCL PORCH | 24 | 34.200 | 821 |

Net Sketched Area: 1897 | Total: 114194
Size Adj | 1188 | Gross Area | 2029 | Fin Area | 1188

## SUB AREA DETAIL
% Ou
| Type | % | Descrip | Sub Area | % Ustd | Sub Usbl | Descrip |

IMAGE

Unit Price | D/S Dep | LUC
500.00 M | 0 | 905

PARCEL ID W-24-0009
Fact NB Fa | Appr Value | JCod JFact | JCod JFact
| | 500 | | 500

Qual | Con | Year
A | AV | 1900

Size/Dim
| | |

Juris. Value

Total: 500

## SPEC FEATURES/YARD ITEMS
| Code | Description | A Y/S | Qty | Size/Dim | Qual | Con | Year | Unit Price | D/S Dep | LUC | Rate | Juris. Factor | Special Features: 0 | Final Total: 86724 | Total Special Features |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MN | SHED SHED | D Y | | 111 | | | | | | | | | | |

More: N | Total Yard Items: 500 | Total Special Features: 0

AssessPro Patriot Properties, Inc.

**Patriot Properties Inc.**

TOTAL ASSESSED: **331,700**
I202491

1 of 1
CARD

Residential

*Fall River*

W-24    0009
Map    Lot

**PROPERTY LOCATION**

| No | Alt No | Direction/Street/City |
|---|---|---|
| 275 | | INDIAN TOWN RD, FALL RIVER |

**OWNERSHIP**

Owner 1: PERRY P D HEIRS
Owner 2:
Owner 3:
Street 1: 275 INDIAN TOWN RD
Street 2:

| Twn/City: FALL RIVER | Cntry | Own Occ: |
|---|---|---|
| St/Prov: MA | | Type: |
| Postal: 02790 | | |

**PREVIOUS OWNER**

Owner 1:
Owner 2:
Street 1:
Street 2:

| Twn/City: | Cntry |
|---|---|
| St/Prov: | |
| Postal: | |

**NARRATIVE DESCRIPTION**
This Parcel contains 4,094,640 SQ FT of land mainly classified
as CHARITY with a(n) CONVENT NL Building Built about
1900, Having Primarily WOOD SHING Exterior and ASPHALT
SH Roof Cover, with 1 Units, 1 Baths, 0 HalfBaths, 0 3/4 Baths,
8 Rooms, 1 and 3 bdrms

**OTHER ASSESSMENTS**

| Code | Descrip/No | Amount | Com Int |
|---|---|---|---|

**PROPERTY FACTORS**

| Item | Code | Descrip | % | Item | Code | Descrip |
|---|---|---|---|---|---|---|
| Z | | | | U | c | ALL UTIL |
| o | | | t | | | |
| n | | | t | | | |
| | Census: | Exempt | | | | |
| | Flood Haz: | | | | | |
| D | | | Topo | 1 | LEVEL | |
| s | | | Street | 1 | PAVED | |
| f | | | Traffic | | | |

**LAND SECTION** (First 7 lines only)

| Use Code | Description | LUC Fact | No of Units | PriceUnits | Land Type | Unit Type | LT Factor | Base Value | Unit Price | Adj | Neigh | Type | Date | Sale Code | Land Size | Land Value | Total Value | Assess'd Value | Notes | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 905 | CHARITY | | 43560 | | SITE | SQ FT | | 0 | 6. | 0.350 | 8006 | | | | | | | | | |
| 905 | CHARITY | | 10 | | SITE | ACRES | | 0 | 5,000. | 1.000 | 8906 | | | | | | | | | |
| 905 | CHARITY | | 20 | | SITE | ACRES | | 0 | 2,000. | 1.000 | 9106 | | | | | | | | | |
| 905 | CHARITY | | 63 | | SITE | ACRES | | 0 | 1,000. | 1.000 | 9306 | | | | | | | | | |

| Total ACHA: 94 | Total SFSM: 4094640.00 | Parcel LUC: 905 | CHARITY | Prime NB Desc: Res 06 SF |

**IN PROCESS APPRAISAL SUMMARY**

| Use Code | Building Value | Yard Items | Land Size | Land Value | Total Value |
|---|---|---|---|---|---|
| 905 | 86,700 | 500 | 4094640.000 | 244,500 | 331,700 |
| | | | | | |
| Total Card | 86,700 | 500 | 94,000 | 244,500 | 331,700 |
| Total Parcel | 86,700 | 500 | 94,000 | 244,500 | 331,700 |

Source: Market Adj Cost    Total Value per SQ unit /Card: 279.21    /Parcel: 279.21    Land Unit Type:

**PREVIOUS ASSESSMENT**

| Tax Yr | Use | Cat | Bldg Value | Yrd Items | Land Size | Land Value | Total Value |
|---|---|---|---|---|---|---|---|
| 2005 | 905 | FV | 2,200 | 500 | 4,094,640 | 244,500 | 247,200 |
| 2004 | 905 | FV | 52,000 | 500 | 94 | 223,000 | 275,500 |

**SALES INFORMATION**

| Grantor | Legal Ref | Type | Date | Sale Price | Sale Code | V | Tst | Verif | Assoc PCL Value | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| | N/A | | 1/1/1900 | | | 0 No | No | | | |

**BUILDING PERMITS**

| Date | Number | Descrip | Amount | C/O | Type | Legal Ref | Neigh | Neigh Influ | Neigh Mod | Last Visit | Fed Code | F. Descrip | Infl 1 | % | Infl 2 | % | Infl 3 | % | Tst | Verif |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**ACTIVITY INFORMATION**

| Date | Result | By |
|---|---|---|

Sign:    VERIFICATION OF USER VOTE DATA

| Appraised Value | Alt Class | % | Spec Land | J Code | Fact | Use Value | Notes |
|---|---|---|---|---|---|---|---|
| 91,476 | | | | | | 91,500 HOME | |
| 50,000 | | | | | | 50,000 REAR A | |
| 40,000 | | | | | | 40,000 REAR A | |
| 63,000 | | | | | | 63,000 REAR A | |

| Total: | 244,476 | Spl Credit | Total: | 244,500 |

pdavis

| User Acct |
|---|
| GIS Ref |
| GIS Ref |
| Insp Date |

**Legal Description**

| | Entered Lot Size |
|---|---|
| | Total Land |

Parcel ID W-24-0009

| Assess'd Value | Notes | Date |
|---|---|---|
| 247,200 yearandroll | | 12/1/2004 |
| 275,500 Conversion | | 1/1/2004 |

**PRINT**

| Date | Time |
|---|---|
| 03/01/05 | 11:45:17 |

**LAST REV**

| Date | Time |
|---|---|
| 01/11/05 | 10:46:03 |

apro
20249

**PAT ACCT.**

**USER DEFINED**

| Prior Id # 1: | |
|---|---|
| Prior Id # 2: | |
| Prior Id # 3: | |
| Prior Id # 1: | |
| Prior Id # 2: | |
| Prior Id # 1: | |
| Prior Id # 2: | |
| Prior Id # 3: | |

ASR Map:
Reval Dist:
Year:
LandReason:
BldReason:
Name: / /

Fact Dist:

Disclaimer: This information is believed to be correct but is subject to change and is not warranted.    Database: AssessPro

2006

STATE LIBRARY OF MASSACHUSETTS
SPECIAL COLLECTIONS

1861 S 96

several individual proprietors, when the lots were assigned to them in severalty, was absolute, "to them and their heirs forever," that this title cannot be changed, but by their consent, except that the right to sell and alienate the same, which was then withheld, may be conferred on them by the general court, if, in its wisdom, it should ever see fit to do so. If any of the families have "abandoned the lands entirely," their title is not thereby lost, but is merely held in abeyance, and may be resumed, and their right of possession enforced, at any time they choose. Whenever, therefore, a new division and assignment of the lands may be deemed advisable, it must be done in reference to existing rights, and the first step to be taken therein, very clearly, should be to ascertain what those rights are.

The Fall River Indians, as may already have been inferred, were not originally a distinct tribe or community, and the word "tribe," as applied to them, is used simply as a matter of convenience to designate the descendants of those friendly Indians, who served the whites in the company of Capt. James Church, in the war against King Philip, and received from the government of the Province of Massachusetts the land constituting their present plantation, in consideration of those services. They are descendants of the tribe of the Wampanoags, and are distinct from the remaining Indians of the region thereabout (who had a common origin with them) only by the fact of their possession of the plantation, and, in consequence thereof, being placed under guardianship by the government of the State. The facts from which to compile their statistics are very meagre and unsatisfactory. The number of persons named in the document assigning the several shares of their land, in 1764, was seventy-two, but there is reason to believe that several of these had children who were not named therein. From that time forward there appears to be no record, either of their names or numbers, till the visit of the State commissioners to their plantation in 1848, a period of about eighty-four years. In the report of those commissioners, it is stated that "the population of the tribe is thirty-seven," and, of these, "eighteen or twenty, who are considered as belonging to the tribe, do not live on the territory." From the present enumeration of the tribe, which gives them seventy-eight members, it is quite certain that the number in 1848 must have been over eighty, as the deaths

which have since occurred among those whose names were then returned, exceed the number of births in the same families by not less than five, the deaths having been at least twelve, and perhaps more, while the births in the same period have been only seven. There are at present on the plantation six families consisting of twenty-one persons; of those not residing on the plantation there are nine families and fifty-seven persons, if we include five whose present residence has not been certainly ascertained, and some of whom, possibly, may not be living. Of those not residing on the plantation, it is believed that none except the families of Mrs. Mitchell and Joseph C. Robinson have acquired settlements elsewhere, and all of them, with that exception, would, as members of the tribe, in case of want, look to the guardian for assistance.

This tribe has no municipal or other organization. The entire management of the land, except the trifling portion that is cultivated by the residents thereon, with the income derived from rents and the sale of wood, is in the hands of the guardian, and all expenditures of money derived from those sources, or from the State, for the benefit of the tribe or any of its members, are made by him, at his own discretion. The children attend the public schools, and have the same advantages for education as other children in their vicinity, so far as they choose to avail themselves thereof. The legislature of 1857 appropriated one hundred and sixty dollars, with which the guardian purchased three pews in the North-Westport meeting-house, convenient to the plantation for the use of the members of the tribe.

The quality of most of the land on this plantation is good, estimated to be worth fifteen or twenty dollars an acre, on the average; in this respect much excelling that of any of the other Indian reservations, unless we may possibly except the small one at Webster and a portion of Gay Head. Its location is in the near vicinity of a busy and thriving manufacturing city, where industry and its fruits always command an adequate reward, and, in the midst of an industrious, moral, and intelligent community, whose example ought to exert a beneficent influence. With these advantages in their favor, we might reasonably look, here, for a better state of things,—more comfort, more respectability, and a better development of character than is to be found in any of the other tribes. But it is not so.

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

ALBERT HENRY CORLISS

**(b)** County of Residence of First Listed Plaintiff  SUFFOLK
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

PRO SE

## DEFENDANTS

CITY OF FALL RIVER

County of Residence of First Listed Defendant  NORFOLK
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

CORP. COUNCIL THOMAS F. MCGUIRE, JR. ESQ

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. § 1983

Brief description of cause:
OPPOSITION TO POLICY OF CITY OF FALL CONTROLLING WATUPPA INDIAN RESERVATION

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 19,001,650.00

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _ALBERT HENRY CORLISS vs._
_CITY OF FALL RIVER_

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
   COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

   ___  I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ___  II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.      for patent, trademark or copyright cases

   ___  III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

   ___  IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

   ___  V.   150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
   HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

   _____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
   COURT?
                                                          YES          (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
   PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                          YES          (NO)
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                          YES          (NO)

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
   28 USC §2284?
                                                          YES          NO

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
   COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
   SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                         (YES)         NO

   A.  IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

       (EASTERN DIVISION)           CENTRAL DIVISION              WESTERN DIVISION

   B.  IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
       GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

       EASTERN DIVISION             CENTRAL DIVISION              WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  _ALBERT H. CORLISS    CA #97160 - INACTIVE_
ADDRESS  _1514 BEACON ST. #43   BROOKLINE MA 02446_
TELEPHONE NO.  _(617) 731-1309_

(Cover sheet local.wpd - 11/27/00)